Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/27/2017 09:13 AM CDT

State of Nebraska, appellee, v.
Anthony L. Burries, appellant.
___ N.W.2d ___

Filed August 4, 2017.    No. S-15-1008.

1. **Appeal and Error.** An appellate court independently decides questions
   of law presented on appeal.
2. **Constitutional Law: Self-Incrimination: Appeal and Error.** Whether
   a defendant voluntarily made a statement while in custody and whether
   a defendant unambiguously invoked his or her right to remain silent or
   to have counsel present are mixed questions of law and fact. An appel-
   late court reviews a trial court's finding of historical facts for clear error
   and independently determines whether those facts satisfy the constitu-
   tional standards.
3. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules
   apply, the admissibility of evidence is controlled by such rules; judicial
   discretion is involved only when the rules make discretion a factor in
   determining admissibility.
4. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence
   Rules commit the evidentiary question at issue to the discretion of the
   trial court, an appellate court reviews the admissibility of evidence for
   an abuse of discretion.
5. ____: ____. An appellate court reviews for abuse of discretion a trial
   court's evidentiary rulings on relevance, whether the probative value of
   evidence is substantially outweighed by the danger of unfair prejudice,
   and the sufficiency of a party's foundation for admitting evidence.
6. **Rules of Evidence: Other Acts.** An appellate court reviews for abuse
   of discretion a trial court's evidentiary rulings on the admissibility of a
   defendant's other crimes or bad acts under Neb. Evid. R. 404(2), Neb.
   Rev. Stat. § 27-404(2) (Reissue 2016), or under the inextricably inter-
   twined exception to the rule.
7. **Judgments: Words and Phrases.** An abuse of discretion occurs when
   a trial court's decision is based upon reasons that are untenable or

unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

8. **Rules of Evidence: Appeal and Error.** When judicial discretion is not a factor, whether the underlying facts satisfy the legal rules governing the admissibility of a proponent's evidence is a question of law, subject to de novo review.

9. **Rules of Evidence: Hearsay.** Hearsay is not admissible except as provided by the Nebraska Evidence Rules.

10. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.

11. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.

12. **Effectiveness of Counsel: Appeal and Error.** An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.

13. **Constitutional Law: Miranda Rights.** The warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are an absolute prerequisite to interrogation and fundamental with respect to the Fifth Amendment privilege.

14. **Miranda Rights: Waiver: Proof.** If a defendant seeks suppression of a statement because of an alleged violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the State must prove that the defendant validly waived his or her *Miranda* rights by a preponderance of the evidence.

15. **Miranda Rights: Waiver: Appeal and Error.** An appellate court looks to the totality of the circumstances to determine whether a defendant validly waived his or her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). A valid waiver must be made knowingly and voluntarily, in the sense that it was the product of a free and deliberate choice and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Factors to be considered include the suspect's age, education, intelligence, prior contact with authorities, and conduct.

16. **Miranda Rights: Police Officers and Sheriffs.** Law enforcement officers are not required to rewarn suspects from time to time of their rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions.

17. **Miranda Rights.** The precise advisement language set out in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is not mandatory.

18. **Right to Counsel: Waiver.** The key inquiry in determining whether a defendant waived his or her right to counsel during an interrogation is whether the defendant was made sufficiently aware of his or her right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel.

19. **Self-Incrimination: Right to Counsel: Waiver: Proof.** Although an express written or oral statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of the waiver, it is not dispositive.

20. **Effectiveness of Counsel.** A defense counsel is not ineffective for failing to raise an argument that has no merit.

21. **Effectiveness of Counsel: Proof: Appeal and Error.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order.

22. **Effectiveness of Counsel: Proof.** To show prejudice under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

23. **DNA Testing: Evidence.** The relevance of DNA evidence depends on its tendency to include or exclude an individual as the source of a biological sample.

24. **Expert Witnesses.** A court should exclude an expert's opinion when it gives rise to two conflicting inferences of equal probability, so the choice between them is a matter of conjecture.

25. **Rules of Evidence: Expert Witnesses: DNA Testing.** A DNA expert's testimony that there may have been a minor contributor's DNA in a biological sample is irrelevant evidence because it is not probative of the source of the DNA.

26. **Trial: DNA Testing: Evidence.** A DNA expert's inconclusive results that a defendant cannot be excluded as a minor contributor to a biological sample allows the jury to speculate that the defendant might have been the minor contributor when the expert fails to provide any statistical relevance for the detected alleles in relationship to the defendant's DNA profile.

27. ____: ____: ____. The value of inconclusive DNA testing results is substantially outweighed by the danger that the evidence will mislead the jurors absent statistical evidence that will help them to assess whether a defendant is or is not the source of DNA found in a biological sample.

28. **Postconviction: Effectiveness of Counsel: Appeal and Error.** When a defendant's appellate counsel is not the defendant's trial counsel, the defendant must raise on direct appeal any claim that the trial counsel provided ineffective assistance, if the issue is known to the defendant or apparent from the record, in order to avoid a procedural bar to raising the claim later in a postconviction proceeding.

29. **Effectiveness of Counsel: Proof: Appeal and Error.** An appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by a trial counsel when raising an ineffective assistance claim on direct appeal.

30. **Trial: Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question. An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.

31. **Effectiveness of Counsel: Records: Appeal and Error.** An appellate court will address a claim on direct appeal that a defendant's trial counsel was ineffective only if the record is sufficient to adequately review the question.

32. **Rules of Evidence: Other Acts.** The list of permissible purposes under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), is not exhaustive.

33. ____: ____. Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.

34. ____: ____. Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.

35. **Homicide: Rules of Evidence: Other Acts: Time.** Evidence of a murder defendant's previous threat to the victim or statement to others showing a desire to harm or kill the victim are facts that are inextricably intertwined with the charged murder if the defendant made the threat or statement fairly close in time to the murder.

36. **Criminal Law: Witnesses.** A defendant's attempted intimidation or intimidation of a State's witness is evidence of the defendant's conscious guilt that a crime has been committed and serves as a basis for an inference that the defendant is guilty of the crime charged.

37. **Rules of Evidence: Other Acts: Proof.** Pursuant to Neb. Evid. R. 404(3), Neb. Rev. Stat. § 27-404(3) (Reissue 2016), before the prosecution can offer evidence of a criminal defendant's extrinsic acts under rule 404(2), it must first prove to the trial court, by clear and convincing evidence and outside the jury's presence, that the defendant committed the act.

38. ____: ____: ____. Upon objection to evidence offered under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), the proponent must state on the record the specific purpose or purposes for which the evidence is being offered, and the trial court must similarly state the purpose or purposes for which it is receiving the evidence. A trial court must then consider whether the evidence is independently relevant, which means that its relevance does not depend upon its tendency to show propensity.

39. **Rules of Evidence: Other Acts.** Evidence offered under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), is subject to the overriding protection of Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), which requires a trial court to consider whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

40. **Trial: Rules of Evidence: Other Acts: Juries.** When requested, the trial court must instruct the jury on the specific purpose or purposes for which it is admitting the extrinsic acts evidence under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), to focus the jurors' attention on that purpose and ensure that it does not consider it for an improper purpose.

41. **Trial: Rules of Evidence: Other Acts: Appeal and Error.** A proponent's clear explanation for evidence offered under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), ensures that a trial court has an opportunity to examine the evidence for its independent relevance and the potential for unfair prejudice. The requirement that the trial court state on the record the purpose or purposes for which such evidence is received is primarily to ensure that an appellate court can review the trial court's ruling.

42. **Rules of Evidence: Proof.** Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2016), requires authentication or identification of evidence sufficient to support a finding that a matter is what the proponent claims as a condition precedent for admission.

43. ____: ____. Authentication or identification under Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2016), is not a high hurdle. A proponent is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity. If the evidence is sufficient to support a finding that the evidence is what it purports to be, the rule is satisfied.

44. **Circumstantial Evidence.** The identity of a participant in a telephone conversation may be established by circumstantial evidence such as the circumstances preceding or following the telephone conversation.

45. **Hearsay: Words and Phrases.** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted.

46. **Hearsay.** A declarant's out-of-court statement offered for the truth of the matter asserted is inadmissible unless it falls within a definitional exclusion or statutory exception.

47. **Rules of Evidence: Hearsay.** The hearsay exception under Neb. Evid. R. 803(1), Neb. Rev. Stat. § 27-803(1) (Reissue 2016), for a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," comprises excited utterances.

48. ____: ____. Excited utterances are an exception to the hearsay rule, because the spontaneity of excited utterances reduces the risk of inaccuracies inasmuch as the statements are not the result of a declarant's conscious effort to make them. The justification for the excited utterance exception is that circumstances may produce a condition of excitement which temporarily stills the capacity for reflection and produces utterances free of conscious fabrication.

49. **Rules of Evidence: Hearsay: Proof.** For a statement to be an excited utterance, the following criteria must be met: (1) There must be a startling event, (2) the statement must relate to the event, and (3) the declarant must have made the statement while under the stress of the event.

50. **Rules of Evidence: Hearsay: Time.** An excited utterance may be subsequent to the startling event if there was not time for the exciting influence to lose its sway. The true test for an excited utterance is not when the exclamation was made, but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event.

51. **Rules of Evidence: Hearsay: Police Officers and Sheriffs.** The period in which the excited utterance exception applies depends on the facts

of the case. Relevant facts include the declarant's physical conditions or manifestation of stress and whether the declarant spoke in response to questioning. But a declarant's response to questioning, other than questioning from a law enforcement officer, may still be an excited utterance if the context shows that the declarant made the statement without conscious reflection.

52. **Pretrial Procedure: Evidence: Juries.** A motion in limine is a procedural step to prevent prejudicial evidence from reaching the jury.

53. **Trial: Pretrial Procedure: Evidence: Appeal and Error.** When a motion in limine to exclude evidence is overruled, to preserve error for appeal, the movant must renew the objection when the particular evidence which was sought to be excluded by the motion is offered during trial.

54. **Criminal Law: Juries: Evidence: Appeal and Error.** In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the error was harmless beyond a reasonable doubt.

55. **Verdicts: Juries: Appeal and Error.** Harmless error review looks to the basis on which the jury actually rested its verdict. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

56. **Trial: Evidence.** The erroneous admission of evidence is generally harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

Appeal from the District Court for Douglas County: J Russell Derr, Judge. Affirmed.

Michael J. Wilson and Glenn Shapiro, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Funke, J.

## I. NATURE OF CASE

A jury found the appellant, Anthony L. Burries, guilty of premeditated first degree murder for killing his girlfriend, Tina

Hoult. The court sentenced him to life imprisonment. This is Burries' direct appeal.

## II. BACKGROUND

### 1. EVIDENCE OF CRIME

Hoult lived alone in a southwest Omaha apartment. After she failed to report for her scheduled work shifts on Friday and Saturday, May 16 and 17, 2014, her employer contacted law enforcement. On Sunday morning, May 18, police officers went to her apartment to check on her. A neighbor identified Hoult's car in the parking lot and told the officers that he had not seen Hoult in about 2 days. When she did not respond to knocks at her door, the maintenance manager unlocked the deadbolt to her apartment for the officers. None of the apartment doors had locks on the doorknobs. The deadbolts could only be locked from the inside or by someone using a key from the outside.

The officers found Hoult's body slumped over in a chair with multiple gashes in her skull. She was deceased. They saw blood on the chair, splattered on the walls, and pooled on the floor below her head. Her apartment had no signs of a forced entry or a struggle. No weapons were found in the apartment that could have inflicted Hoult's injuries.

An autopsy revealed that Hoult died from at least nine blows to her head from a heavy instrument with a sharp edge. She had died at least several hours before she was found, but the pathologist could not determine the time or date of her death.

Steffanie Beck was a long-time friend of Hoult who testified that Burries had been Hoult's boyfriend, on and off, for 11 to 12 years before her death. He was also romantically involved with Harmony Howard, who was the mother of his son.

Howard learned about Burries' relationship with Hoult when Burries was arrested in December 2012 for assaulting Hoult. After he was arrested for the assault, he called Howard to tell her that her car, which he had borrowed, was in the parking

lot of Hoult's apartment complex. One of Burries' roommates drove Howard there to get it. As a result, Howard knew the location of the complex where Hoult lived, but she did not know which apartment was Hoult's.

At Burries' trial, the State submitted cell phone records showing text messages that Hoult and Burries exchanged from late Tuesday, May 13, 2014, until the early morning of Friday, May 16. A little before midnight on Tuesday, Burries began texting Hoult stating that he wanted to come to her apartment. Hoult responded that he should stay where he was and expressed dissatisfaction with their relationship. Burries' texts expressed his frustration with Hoult. This texting stopped at about 1:45 a.m. on Wednesday.

On Wednesday evening, May 14, 2014, Howard drove Burries to a bar close to Hoult's apartment where Hoult and other residents at the apartment complex would often socialize. When Burries returned after 10 to 15 minutes, Howard said he seemed agitated and she drove him home. Late Wednesday night, Burries began texting Hoult again. She responded that her cell phone was not working properly and that she was going to bed.

On Thursday, May 15, 2014, beginning about 6 a.m., Burries texted Hoult multiple times that he was coming over for sex. Hoult repeatedly responded that she was not interested and to leave her alone. He accused her of being with other men and lying about being at work. She responded that she was tired of him trying to control her and threatening her. She specifically stated that he should not have threatened to torture her or say that she "owe[d him] a limb." She wrote that she did not feel safe around him. Burries responded that she had caused his conduct by being disrespectful: "[L]ook at everything you've been doing lately just disrespect after another. All intentional and you think i'm not going to be mad. . . . You caused all of this and you ain't getting away with it. . . . You lucky I haven't fucked you up fur all this shit." When he said he could easily come to her apartment, she responded that she did not want

him to; she wanted him to leave her alone. The text messages stopped Thursday morning.

Around 10:30 or 11 p.m. on Thursday, May 15, 2014, Burries called Howard to borrow her car. She went and picked him up, and he dropped her off at her house before going to a bar. She said that he was wearing a striped shirt over a black tank top, jeans, and white athletic shoes.

About 11:30 p.m. on Thursday, Hoult went to visit Adrian Hogan, who was a resident at Hoult's apartment complex. Hogan said that Hoult left his apartment about 1:30 a.m. on Friday.

At about 3:20 a.m. on Friday, May 16, 2014, Burries texted Hoult that he needed to see her and that he knew she was home. At 3:25 a.m., he sent another text message that if her cell phone was not working, he would just show up. Hoult opened these messages but did not respond.

Howard came to Burries' house about 3:30 a.m. on Friday. When she arrived, Burries approached her car in his driveway and told Howard to take him to the intersection that was close to Hoult's apartment complex. Howard said she was frightened by a look Burries gets in his eyes: "[I]t's like a blank look. It's almost like looking in the eyes of the devil." She drove him to the requested intersection.

When they got to the intersection, Burries told Howard that he needed to talk to Hoult. Howard drove to Hoult's apartment complex, and Burries directed her to Hoult's apartment. She waited in her car for 2 to 5 minutes while Burries went inside. She estimated that she dropped Burries off at Hoult's apartment between 3:30 to 4 a.m. Cell phone records showed that at 3:34 a.m., Hoult received two text messages from Burries and that she opened them. At 3:40 a.m., Hoult texted Burries that he should be sleeping. That was the last text message she sent. Burries' cell phone did not receive this message until 5:54 a.m.

When Burries returned to Howard's car, he told her to "'[d]rive,'" in an "[a]ngry, firm" tone. Howard said that she

was afraid because he was yelling at her not to look at him and not to pull up next to anyone. She did not see anything in his hands, but she believed that the car's dome light was off. She said that he had grabbed his cream-colored coat from the back seat and laid the coat over his lap.

Burries had Howard drive past his house and eventually told her to stop in front of a randomly chosen house which was close to a bridge in south Omaha. He was screaming at Howard that she was the only person who knew that he was "there," which she understood to mean at Hoult's apartment, and that she would be an accessory if she told anyone. Howard said that she was not concerned then about what he might have done to Hoult, because she was afraid of what he might do to her. He instructed her to drive across the bridge. While they were crossing the bridge, he rolled down the passenger window and threw something out. Howard did not see what he threw out because he told her not to look at him. Howard then dropped Burries off at his house. It was almost 5 a.m. when Howard returned to her home.

As stated, Burries' cell phone did not receive Hoult's last text message until 5:54 a.m. on Friday. The testimony of an investigator who performed digital forensics for the State showed that if a person puts his or her cell phone into airplane mode or turns it off, it will not receive a text message during this period. The cell phone records showed that approximately 4 minutes after receiving Hoult's last text message, Burries responded. He asked why she had not answered his messages. He said that he had done what she asked and burned all the clothes that reminded her of "that night" in the fireplace and that he wanted to move on. He repeated that he wanted to come over and accused her of playing games by ignoring his text messages. His periodic text messages to Hoult continued until 9 p.m. on Friday. None were opened.

Between 4 and 5 a.m. on Friday, Burries also contacted Melissa Eledge, whom he had been seeing and asked her to pick him up. Eledge arrived at Burries' house before 6 a.m.

She said that Burries was intoxicated and asked her to take him to his brother's house. He was carrying a gray or black bag. Eledge waited in the car while Burries went inside his brother's house for 5 to 10 minutes. When he returned, he asked Eledge to take him to a tire store. When they arrived, Burries took the bag and went to a house next to the tire store. He did not explain his actions to Eledge.

After that stop, Eledge took Burries back to his house. During the drive, Burries told Eledge that he was texting an old girlfriend named "Tina Hoult." He told Eledge that Hoult was mad at him for wearing the same clothes that he had worn when he went to jail and that she wanted him to get rid of them. When they arrived at Burries' home, Eledge believed that she could smell something that had been burned inside. After Eledge's memory was refreshed, she testified that she had asked Burries about the smell and that he had told her he had been "'burning stuff'" before she arrived.

One of Burries' roommates, Eric Paine, testified that on Friday morning when he woke up, he saw embers from a fire in the fireplace and noticed a heavy smoke smell in the house. Paine said that Burries called him from Howard's house sometime in the early afternoon on Saturday, May 17, 2014. Burries asked him to buy him some items from a store. When Paine arrived at Howard's house, Burries was cleaning a boat with Howard's father and asked Paine to pick up two bottles of ammonia for cleaning.

Burries texted Eledge on Saturday between 1 and 2 p.m. to tell her that he was going to Iowa. About 2:30 p.m., he arrived at the house where Eledge was. He brought cleaning supplies and carpet shampoo with him for cleaning out the car he was driving. Unknown to Eledge, Burries had arrived in Howard's car. He and Eledge cleaned Howard's car for about an hour. About 3 to 4 p.m. on Sunday, May 18, 2014, Burries told Eledge he was going fishing with friends and left.

Sunday evening, Howard called Burries to ask when he would be returning her car. Burries told her that Hoult had

been found "fucked up in her apartment" and that he was going to call the detectives to "clear his name." He returned her car a couple of minutes later. Police officers arrived at Howard's house shortly thereafter and seized the car.

Also on Sunday evening, investigators arrived at Burries' residence, but he was not home. Around midnight, Burries called Paine while investigators were at the house and asked to speak to a police officer. Burries told the officer that he was getting an attorney and planned to come in the next day. Officers noticed that the fireplace had been cleaned out recently, and Paine told them that he had not done it. Investigators searched a bag of ash they found in the trash but did not find any clothing remnants.

On the morning of May 19, 2014, Burries came to Eledge's home. While there, he told her that he needed to get out of town. He seemed "frazzled," and kept saying that "[i]t was bad" and he needed to get out of town. He told Eledge that he was going to St. Louis and asked if she would at least take him to Kansas City. Shortly thereafter, they left her house and traveled to "St. Joe." During the trip, Burries had two cell phones with him and would power them off when he was not using them.

### 2. BURRIES' STATEMENTS TO POLICE INVESTIGATORS

A Missouri state trooper arrested Burries in Missouri at about 5 p.m. on Monday. Two Nebraska investigators traveled to Missouri to interview him. After Det. Larry Cahill, with the Omaha Police Department, advised Burries of his *Miranda*[1] rights, he asked if knowing these rights, Burries was willing to talk to the officers. Burries said, "Within limitations, I'll talk to you." During the investigation, Burries stated that he and Hoult had hit each other during their fights and

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

admitted that he had been incarcerated from December 2012 to November 2013. He admitted that Hoult had given him a key to her apartment. He admitted to burning his clothes between 3 and 5 a.m. on Friday. He stated that at Hoult's request, he had burned his jeans, a cream-colored jacket, and a black hoodie in his fireplace. But when Cahill informed Burries that investigators had learned from Howard that he was at Hoult's apartment when she was murdered and that he had told Howard not to talk about it, Burries cut off the interview until he had an attorney.

### 3. Pretrial Proceedings

Before trial, the State filed notice that it intended to present evidence under Neb. Evid. R. 404.[2] It also requested a pretrial hearing to determine the voluntariness of Burries' statements to investigators. Burries moved in limine to exclude the evidence that the State wanted to present. He argued it was inadmissible on grounds of foundation, relevance, hearsay, or prejudice.

For the voluntariness portion of the hearing, the court admitted the audio recording of the investigator's interview of Burries in Missouri. The court later ruled in a written order that the statement was admissible.

Regarding the State's rule 404 motion, the State argued that it intended to prove Burries had assaulted Hoult in December 2012, had served a year of imprisonment for the crime, and had harmed or threatened Hoult since 2012. For the hearing, the court admitted a copy of the complaint, conviction, and sentencing order for the 2012 assault, which evidence showed Burries was convicted of assaulting Hoult and was sentenced to 2 years' imprisonment. In addition to these documents, the State intended to present the testimony of witnesses who had seen Hoult after the 2012 assault. The State also intended to call "a number of witnesses" to prove "motive, opportunity,

---

[2] See Neb. Rev. Stat. § 27-404 (Reissue 2016).

intent, preparation, plan, knowledge, and identity." But it did not specify the purpose for admitting any witness' testimony, and it argued that its evidence "may not be [rule] 404 evidence but rather really res gestae of the crime."

In support of its res gestae argument, the prosecutor stated that Burries had told his roommate that the clothes he burned on Friday morning were the clothes that still had blood on them from the last time he assaulted Hoult. The State argued that because of Burries' statement, the 2012 assault was res gestae to the murder crime: "[A]rguably, the clothes he was burning [were] either bloody clothes from the actual event in this case or the previous assault." The State also argued that the 2012 assault was inextricably intertwined with the murder charge because very soon after the murder, Burries had told Cahill that he had burned his clothes. Additionally, the State intended to present the testimony of witnesses who would say they had overheard telephone conversations in which Burries had threatened Hoult before her murder.

After the hearing, the court issued an order in which it addressed both the State's rule 404 motion and Burries' motion in limine resisting the evidence. The court ultimately accepted the State's argument that Burries' December 2012 assault of Hoult was inextricably intertwined with her murder in May 2014:

> [T]he events surrounding the December, 2012 incident, including [Burries'] conviction, are admissible, particularly because there is evidence of the burning of clothes by [Burries] so close to the time of the murder of . . . Hoult. The State will argue this was an act of [Burries] to dispose of the evidence of . . . Hoult's murder even though [Burries] argues that the clothes that were burned were from the 2012 incident. The 2012 incident is an integral part of the allegations against [Burries] in this case such that the evidence may "complete the story or provide a total picture of the charged crime[.]"

The court then set out the specific testimony that it would allow from the State's witnesses. It rejected Burries' relevance, hearsay, and foundation challenges to the witnesses' testimonies.

### 4. STATE'S EVIDENCE AT TRIAL OF BURRIES' OTHER BAD ACTS

Despite the court's inextricably intertwined ruling, just before the State presented evidence at trial, the court again heard argument as to the State's evidence of Burries' other bad acts. The court ruled that Burries' attorney could have a standing objection to the rule 404 evidence that the court ruled on in its pretrial order. The court rejected Burries' request to give an instruction limiting the jurors' consideration of the evidence to help them decide whether he had a motive to murder Hoult. The court stated that it was "just going to read [rule] 404(2), as to evidence of other crimes, wrongs, et cetera." The State agreed to this approach, arguing that all of its intended evidence was relevant to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absen[ce of] mistake or accident."

One of the court's approved witnesses was the apartment complex maintenance manager. He stated that in 2010, Hoult moved into apartment No. 19. He also testified that in December 2012, Hoult asked him to come to her apartment, at which time he saw that she had been beaten. Her eyes were blackened, and he saw blood on her face, arms, and neck. The manager then changed Hoult's lock, and later that month, she moved to apartment No. 142. He said he changed her locks at least three times before she moved to apartment No. 142. After the manager's testimony, in the jury's presence, the State submitted exhibit 1, which it described as a copy of Burries' conviction and sentence for assaulting Hoult on December 1, 2012.

Brian Coburn was Hoult's neighbor when she lived in apartment No. 142. He testified that when he first met Hoult

in October 2012, she had obviously been beaten up because her eyes were blackened and swollen. Coburn testified that he knew Hoult had a boyfriend named "Tony." About a month before Hoult's murder, Coburn was out by the parking lot with Hoult when a car passed them. Hoult identified the driver as "Tony," and then received a call from "Tony." She put the call on "speaker," and Coburn could hear Tony asking Hoult where she was. Hoult said she was home, and Tony called her a "'fucking liar'" and said, "'I will find you, you cunt — you f'ing cunt.'" Coburn said Hoult looked a little nervous but brushed it off. Coburn said that on the Sunday before Hoult was murdered, Hoult came to his apartment and asked him to check her apartment because she thought "Tony" was inside.

Another witness testified that in 2014, he and his wife lived across the hall from Hoult's apartment. He testified that when Hoult was moving into apartment No. 142, he saw her in the hall and she had a black eye. She told him that the black eye was the reason she was moving.

Terry Robinson also lived in Hoult's apartment complex and met her in the summer of 2013. About the middle of April 2014, he was with Hoult and other neighbors in the outside commons area when her cell phone rang. She told Robinson that he could answer it, and he saw the name "Tony" on her cell phone. A male, whom Robinson believed to be Burries, asked where Hoult was and said that "he did time once for [Hoult] and he wasn't scared to do it again."

On Monday, May 12, 2014, Robinson and three other people were with Hoult in her apartment when her cell phone rang. She told Robinson that the call was from "Tony," and Robinson could hear that the male caller was upset. Hoult held the cell phone so he could listen. "Tony" said that Hoult had "'better be [home] when [he] g[o]t there'" and that he had come by the previous night and she was not home. Robinson said Hoult "teared up" during this call. He and Hoult's other guests then went outside while she was talking. When Hoult joined them,

she told Robinson that "Tony" had accused her of cheating and threatened to "beat her, revive her, and repeat it."

As stated, Steffanie Beck was Hoult's long-time friend and had worked with Hoult for 4 years before the murder. Beck had never met Burries, but she knew he was Hoult's boyfriend. Beck said that she knew Burries' voice because he had called Hoult many times from jail when Beck was present, and Hoult would hold the cell phone so that Beck could hear him. While Burries was incarcerated, Beck said she had heard him accuse Hoult of cheating and threaten to "kill her, tear her face off, cut her legs off."

Beck also said that when Burries was going to be released, Hoult was nervous and planned to leave the state and move in with her mother. Beck testified that the last time she saw Hoult was on Thursday afternoon, May 15, 2014, when Beck was leaving work and Hoult was walking in from the parking lot. Although it was a hot day, Hoult was wearing a long-sleeved jacket. Beck thought Hoult was hiding something and convinced Hoult to take the jacket off. Beck said that Hoult had bruising on her arms from her elbows to her shoulders but told Beck it was nothing.

Howard testified that she had received a 4-page handwritten letter from Burries a few days before giving her trial testimony. After the court gave its rule 404(2) instruction, it allowed the prosecutor to read the entire letter verbatim. In the letter, Burries warned Howard that he would be getting out shortly and not to "lie" at his trial. He threatened retribution to anyone who interfered with his ability to rear his children.

## 5. DNA EVIDENCE

At trial, Mellissa Helligso, a forensic DNA analyst, testified for the State about her testing of a blood sample from Hoult's arm. Helligso testified the testing showed that the blood was from a single source and that Hoult could not be excluded as the contributor, because every allele she detected in Hoult's DNA profile matched the alleles that she found in the blood

sample. An allele is a genetic variation in the sequencing of the DNA molecule at one of the specific segments, or loci, with known individual variations, which forensic analysts focus on to determine an individual's DNA profile.[3] The prosecutor also elicited Helligso's testimony that the DNA testing had produced an allele that could have been a common "artifact" that the testing produces or it could have come from another person, but that she could not compare a single allele to another person's profile.

Burries' attorney did not object to the prosecutor's questions or the expert's testimony. On cross-examination, he elicited testimony that the allele could have come from someone else and that the State's expert had not analyzed Burries' DNA profile.

### III. ASSIGNMENTS OF ERROR

Burries assigns, restated and renumbered, that the court erred as follows:

(1) in finding that Burries' statements to investigators were voluntary;

(2) in admitting evidence of his 2012 assault of Hoult and threats that he made to her because the evidence constituted hearsay, lacked proper foundation, was irrelevant, or was inadmissible under Neb. Evid. R. 403[4];

(3) in allowing the State to introduce the same evidence under rule 404(2) and as part of the res gestae of the crime;

(4) in admitting an August 2015 letter from Burries to Howard, because the evidence was inadmissible under rules 403 and 404.

Additionally, Burries assigns that his trial counsel provided ineffective assistance as follows:

(1) in failing to file a motion to suppress Burries' statements to investigators when the recorded interview showed

---

[3] See *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015).

[4] Neb. Rev. Stat. § 27-403 (Reissue 2016).

that Burries did not understand his constitutional right to a court-appointed attorney;

(2) in failing to object to irrelevant DNA evidence and exacerbating the jury's likely confusion by eliciting testimony that Burries could have been the contributor;

(3) in failing to renew an objection to the certified copy of Burries' assault conviction; and

(4) in failing to adequately investigate and present several aspects of Burries' defense.

## IV. STANDARD OF REVIEW

[1,2] An appellate court independently decides questions of law presented on appeal.[5] Whether a defendant voluntarily made a statement while in custody and whether a defendant unambiguously invoked his or her right to remain silent or to have counsel present are mixed questions of law and fact. We review a trial court's finding of historical facts for clear error and independently determine whether those facts satisfy the constitutional standards.[6]

[3-7] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[7] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[8] We review for abuse of discretion a trial court's evidentiary rulings on relevance,[9] whether the probative value of evidence is

---

[5] See, e.g., *State v. Benavides*, 294 Neb. 902, 884 N.W.2d 923 (2016); *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016); *In re Interest of Edward B.*, 285 Neb. 556, 827 N.W.2d 805 (2013).

[6] See *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

[7] *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016).

[8] *State v. Draper*, 295 Neb. 88, 886 N.W.2d 266 (2016).

[9] *State v. Patton*, 287 Neb. 899, 845 N.W.2d 572 (2014).

substantially outweighed by the danger of unfair prejudice,[10] and the sufficiency of a party's foundation for admitting evidence.[11] We also review for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under rule 404(2), or under the inextricably intertwined exception to the rule.[12] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[13]

[8-10] When judicial discretion is not a factor, whether the underlying facts satisfy the legal rules governing the admissibility of a proponent's evidence is a question of law, subject to de novo review.[14] Hearsay is not admissible except as provided by the Nebraska Evidence Rules.[15] Apart from rulings under the residual hearsay exception, we review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.[16]

[11,12] Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law,[17] which turns upon the sufficiency of the record to address the claim without an evidentiary hearing[18] or whether the claim rests solely on the interpretation of a statute or

---

[10] *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

[11] *State v. Casterline*, 293 Neb. 41, 878 N.W.2d 38 (2016).

[12] See, *Parnell, supra* note 5; *State v. Ash*, 286 Neb. 681, 838 N.W.2d 273 (2013).

[13] *Draper, supra* note 8.

[14] *Smith, supra* note 7.

[15] *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

[16] See *State v. Trice*, 292 Neb. 482, 874 N.W.2d 286 (2016).

[17] See *State v. Betancourt-Garcia*, 295 Neb. 170, 887 N.W.2d 296 (2016).

[18] *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

constitutional requirement.[19] We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.[20]

## V. ANALYSIS

### 1. Burries Validly Waived His Right to Counsel When He Made Incriminating Statements to Investigators

After the pretrial hearing on the admissibility of Burries' statements to police investigators, the court determined that the statements were voluntary:

> There is nothing to suggest that [Burries'] statement was involuntary. While there is no question that [Burries] was in custody at the time, he was advised of his Miranda rights and once he requested an attorney no further substantive questions were asked of [Burries]. Although he mentioned getting an attorney early in the interview, he did not invoke his right to an attorney in such a manner that it was unequivocal.

Burries does not contend that the officer's language was insufficient to convey his *Miranda* right to appointed counsel if he could not afford one. He posits no other language that the officers should have used. Instead, without citing any authority, Burries argues that under these circumstances, the officers should have reread the advisement and confirmed his understanding of his right to a free appointed counsel. We disagree.

[13-15] *Miranda* warnings are "'an absolute prerequisite to interrogation' . . . and 'fundamental with respect to the Fifth Amendment privilege.'"[21] If a defendant seeks suppression

---

[19] See *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014).

[20] See *id.*

[21] See *State v. Juranek*, 287 Neb. 846, 856-57, 844 N.W.2d 791, 801 (2014), quoting *Miranda, supra* note 1.

of a statement because of an alleged *Miranda* violation, the State must prove that the defendant validly waived his or her *Miranda* rights by a preponderance of the evidence.[22] We look to the totality of the circumstances to determine whether a defendant validly waived his or her *Miranda* rights during an interrogation:

> *Miranda* rights can be waived if the suspect does so knowingly and voluntarily. A valid *Miranda* waiver must be voluntary in the sense that it was the product of a free and deliberate choice and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. In determining whether a waiver is knowingly and voluntarily made, a court applies a totality of the circumstances test. Factors to be considered include the suspect's age, education, intelligence, prior contact with authorities, and conduct.[23]

[16] But law enforcement officers "are not required to rewarn suspects from time to time. . . . The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions."[24]

Before questioning Burries, Cahill read him the following *Miranda*[25] advisements: You have the right to remain silent and not make any statements; anything that you may say can be used against you in a court; you have the right to consult with a lawyer and have a lawyer with you when you are questioned; if you cannot afford a lawyer, the court will appoint one to

---

[22] See *State v. Fernando-Granados*, 268 Neb. 290, 682 N.W.2d 266 (2004), citing *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). See, also, *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010), citing *Miranda, supra* note 1.

[23] *State v. Goodwin*, 278 Neb. 945, 956, 774 N.W.2d 733, 743 (2009). Accord *Fernando-Granados, supra* note 22.

[24] See, e.g., *Berghuis, supra* note 22, 560 U.S. at 386-87.

[25] *Miranda, supra* note 1.

represent you. After each statement, Cahill asked Burries if he understood and Burries said yes.

[17] In *Miranda*, the U.S. Supreme Court stated that a suspect

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.[26]

But the precise advisement language set out in *Miranda* is not mandatory.[27]

[18] We have recognized that under *Patterson v. Illinois*,[28] *Miranda* warnings which adequately inform a defendant of his or her Fifth Amendment right to counsel are also adequate to inform a defendant of his or her Sixth Amendment right to counsel.[29] In either case, the "key inquiry" in determining whether a defendant waived his right to counsel during an interrogation is whether the defendant was "made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel."[30] And in analyzing waivers of the right to counsel during an interrogation under both the Fifth Amendment and the Sixth Amendment, the U.S. Supreme Court has held that substantially similar advisements were sufficient to convey to the defendant his right to counsel during the questioning even if he could not afford

---

[26] *Id.*, 384 U.S. at 479.

[27] See, *State v. Nave*, 284 Neb. 477, 821 N.W.2d 723 (2012), citing *California v. Prysock*, 453 U.S. 355, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981); *Fernando-Granados, supra* note 22.

[28] *Patterson v. Illinois*, 487 U.S. 285, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988).

[29] See *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008).

[30] *Patterson, supra* note 28, 487 U.S. at 292-93.

one, and sufficient to convey the consequences of foregoing that right.[31]

[19] Although an "express written or oral statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of the waiver," it is not dispositive.[32] But here, the totality of the circumstances shows that Burries understood his right to consult with counsel and that he voluntarily and intelligently waived that right to the extent that he answered Cahill's questions.

Immediately after Cahill advised Burries of his *Miranda* rights, Burries stated that he would answer questions with some limitations. He explained that he wanted to answer some questions with an attorney present:

> I'm not going to throw the lawyer word out there right now, but I'm going to say this though. There's a lot of things that I would like to talk about. I would like to talk about in the presence of my attorney. I mean I'll get one eventually. I don't [know] when. I don't know how. [Slight pause.] But in [the] simplest terms, this situation with me and [Hoult] has been going on for way too long.

Burries contends that his statement—he did not know when or how he would get an attorney—showed he did not understand that he had the right to a free attorney if he could not afford one. But his other statements during the interrogation refute that argument.

When Cahill asked Burries if he wanted to talk about Friday morning, Burries said, "That's the point where I should probably have somebody here, but I'm going to break it down flat out from the point of 10 talking to her on Thursday evening up 'til going to the bar about 11:30-12, getting home about 2:30-3 in the morning." He then made the incriminating

---

[31] See, *Patterson, supra* note 28; *Prysock, supra* note 27. Accord *Wilkerson v. State*, 365 Ark. 349, 229 S.W.3d 896 (2006).

[32] *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979).

statements about burning his clothes on the night that Hoult was murdered, purportedly because Hoult had asked him to get rid of his clothes from their fight in December 2012, to close the door on their past. He stated that these clothes still had blood on them and that between 3 and 5 a.m. on Friday, he burned his jeans, a cream-colored jacket, and a black hoodie in his fireplace.

Cahill then told Burries that he knew Howard drove him to Hoult's apartment about 3 a.m. and drove him to a bridge afterward where he threw something off the bridge. He said Howard had placed him at Hoult's apartment at the time of the murder and that he knew Burries had told Howard not to talk to anyone about the incident and had burned his clothes after Howard dropped him off at his home. Burries responded that he could not give Cahill any information and cut off the questioning: "I'm going to leave it at that and I'm going to talk to my attorney about it. . . . I'll talk to my attorney, and then we'll talk." Cahill told Burries he could talk to him later with an attorney if he wanted. Burries said that he was definitely going back to Nebraska and that his trip was about getting money for an attorney, not running. Cahill said that after Burries was booked for a homicide in Nebraska, he could get an attorney or one would be appointed, but that their current conversation would stop.

Burries' firm statement that he was ending the interrogation until he could consult with an attorney demonstrated his understanding of his right to do so. Burries' understanding of his rights is further supported by his previous encounters with law enforcement in 2012. Finally, Burries specifically stated that he had gone to Missouri to get money for an attorney, and he was represented by a nonresident attorney at trial.

Under these facts, Burries' statement that he did not know how or when he would obtain an attorney was a reference to his intent to retain a paid attorney. It did not show that he failed to understand his right to have an attorney present even if he could not afford one. It is true that at the end of the

interrogation, Cahill stated that after Burries was booked for homicide in Nebraska, he could get an attorney or one would be appointed. But this statement was made after the questioning had stopped and was in response to Burries' statement that he had gone to Missouri to get money for an attorney. It did not negate Cahill's explicit *Miranda* advisements that Burries was entitled to consult an attorney and have an attorney present during the interrogation and that the court would appoint an attorney if he could not afford one.[33] We conclude that the court did not err in determining that Burries voluntarily and intelligently waived his right to counsel when he answered Cahill's questions, despite understanding his right to terminate the questioning until he obtained an attorney.

[20] This conclusion also resolves Burries' claim that his trial attorney provided ineffective assistance in failing to seek suppression of his statements during the interrogation. A defense counsel is not ineffective for failing to raise an argument that has no merit.[34]

## 2. DEFENSE COUNSEL'S FAILURE TO OBJECT TO DNA EXPERT'S TESTIMONY AND CROSS-EXAMINATION OF EXPERT IS NOT REVERSIBLE ERROR

Burries contends that his trial attorney was ineffective for failing to object to the State's introduction of irrelevant DNA testing results through Helligso, its DNA expert. He argues that under our decision in *State v. Johnson*,[35] the introduction of this evidence was improper. He also contends that his trial counsel was ineffective in cross-examining Helligso because his questions suggested that Burries could have been a contributor to the DNA sample that she testified about.

---

[33] See *Duckworth v. Eagan*, 492 U.S. 195, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989).

[34] See, e.g., *State v. Erpelding*, 292 Neb. 351, 874 N.W.2d 265 (2015).

[35] *Johnson, supra* note 3.

(a) Additional Facts

As previously mentioned, Helligso testified that her testing of the blood sample from Hoult's arm contained DNA from a single source and that Hoult could not be excluded as the contributor because every allele she detected in Hoult's DNA profile matched the alleles that she found in the blood sample. The prosecutor then asked if the detected alleles had matched Hoult's profile perfectly or if there were some alleles in the blood sample "popping up" that did not match. Burries did not object. Helligso said that the testing showed one additional allele, "but it was in a position that is a common artifact when doing DNA testing, and I only had one extra allele. So when I only have one extra allele, I can't really compare that to anyone else, but the major profile and every other single number matched . . . Hoult." Helligso said that the term "artifact" meant something that was not real and just a product of the DNA testing and that there was no way for her to tell whether the allele was an artifact or from another person. She said that she could not "do anything with that information anyway" because she would need three to five additional alleles before she could determine that someone else's DNA was in the sample. She stated that for this reason, she concluded the DNA came from a single source. Burries did not object during this colloquy.

On cross-examination, Burries' attorney asked Helligso if she had determined that the artifact was not an allele because it fell below the threshold requirement for an allele. Helligso said no; it was above the threshold. This colloquy followed:

> Q. . . . Now, you never — you never actually ran [Burries' profile], but there is at least some possibility or maybe a very small possibility that this random allele could be coming from someone else besides . . . Hoult, correct?
>
> A. Yes.
>
> Q. Okay. You never did a profile for . . . Burries, correct?

A. Right.

Q. You also never did a profile for anyone else besides . . . Hoult in this case, correct?

A. Right.

On redirect examination, Helligso testified that even if she had detected a real allele and had the DNA profile for Burries or other persons, she could not have made a comparison with only one allele.

### (b) Ineffective Assistance Standards

[21,22] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[36] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[37] An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order.[38] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[39]

### (c) Admissibility of DNA Evidence

[23] In *Johnson*, we explained that the relevance of DNA evidence depends on its tendency "to include or exclude an individual as the source of a biological sample."[40] We reiterated that DNA evidence without a probability assessment does not aid the trier of fact to make that determination. We concluded that the trial court erred in admitting inconclusive DNA testing results from three biological samples.

---

[36] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[37] *Betancourt-Garcia, supra* note 17.

[38] *Id.*

[39] *Id.*

[40] *Johnson, supra* note 3, 290 Neb. at 879, 862 N.W.2d at 771.

The DNA expert in *Johnson* testified that one DNA sample revealed a partial DNA profile for a minor contributor to the sample; a "'possible mixture'" because the expert had detected a "'possible allele'" separate from the victim's profile but could not determine if it was "'a true allele or not.'"[41] The expert could not draw any conclusions about the contributor to the partial minor profile in a second sample because she had detected only three weak alleles, two of which did not match the defendant's DNA profile. In a third sample, she detected a partial minor profile from a weak DNA sample, but did not explain why she could not exclude the defendant as the contributor despite recording alleles that did not match his profile.

[24-27] We explained in *Johnson* that a court should exclude an expert's opinion when it gives rise to two conflicting inferences of equal probability, so the choice between them is a matter of conjecture.[42] We concluded that a DNA expert's testimony that there may have been a minor contributor's DNA in a biological sample is irrelevant evidence because it is not probative of the source of the DNA.[43] Additionally, we held that a DNA expert's inconclusive results that a defendant cannot be excluded as a minor contributor to a biological sample allows the jury to speculate that the defendant might have been the minor contributor when the expert fails to provide any statistical relevance for the detected alleles in relationship to the defendant's DNA profile.[44] We held that the value of inconclusive DNA testing results is substantially outweighed by the danger that the evidence will mislead the jurors absent statistical evidence that will help them to assess whether a

---

[41] *Id*. at 877, 862 N.W.2d at 770.

[42] *Johnson, supra* note 3.

[43] *Id.*

[44] *Id.*

defendant is or is not the source of DNA found in a biological sample.[45]

### (d) Defense Counsel's Failure to Object to Irrelevant DNA Evidence and Cross-Examination of State's Expert Did Not Prejudice Burries

The State contends that the instant case is distinguishable from *Johnson*. It argues that because Helligso testified that the additional allele she detected was probably an artifact, no inconclusive testing results were presented. It argues that on cross-examination and redirect examination, Helligso was discussing only a hypothetical scenario of "what if the artifact had been a true allele."[46] We disagree.

On direct examination, Helligso testified that she had no way of determining whether she had detected an artifact or an allele from another person. On cross-examination, Helligso conceded that the additional allele she detected during testing was probably an artifact or false reading, but she agreed that she could have detected an allele from another person. On redirect examination, she testified that even if it were a real allele, she could not compare it to another person's profile without detecting three to five alleles.

Helligso's testimony was the functional equivalent of presenting inconclusive DNA evidence that suggested a defendant could be linked to the evidence if investigators had found a better biological sample. We specifically held in *Johnson* that a DNA expert's opinion that there *may* have been a minor contributor's DNA in a biological sample was irrelevant because the evidence was not probative of the source of the DNA.[47] The same problem exists here. Evidence of a minor contributor in the blood sample could only be relevant to Burries' guilt

---

[45] See *id.*

[46] Brief for appellee at 42.

[47] See *Johnson, supra* note 3.

if it tended to include or exclude him as the minor contributor. Because Helligso's opinion did neither, the jurors could find it relevant only through pure speculation. Accordingly, any relevance the evidence had was substantially outweighed by its potential to mislead the jurors.

But we need not consider whether any strategic decision justified defense counsel's failure to object to the evidence. In the context of the State's other evidence, we conclude that there is no reasonable probability that the result of the proceeding would have been different even if Burries' counsel had successfully objected to Helligso's testimony and had not elicited her testimony on cross-examination that the additional allele could have come from someone else and that she had not determined Burries' DNA profile.

First, the DNA evidence was weak. As stated, Helligso conceded that the additional allele was probably an artifact or false reading and that she had no way of determining whether the allele was an artifact or came from another person. Equally important, while the evidence permitted the jurors to speculate that Burries was linked to the evidence, this case is also similar to *Johnson* in that the State's other evidence of Burries' guilt was overwhelming.

Howard's testimony and the State's cell phone records showed that Burries was inside Hoult's apartment within minutes of 3:40 a.m. on Friday, when Hoult sent her last text message to him. After returning to Howard's car, he covered himself from view with his jacket, ordered her not to look at him, and demanded that she drive him across a bridge where he threw something out the passenger window. Shortly before he demanded that Howard drive him across the bridge, he threatened her that she would be prosecuted as an accessory if she told anyone that he had been at Hoult's apartment.

His statements to investigators showed that he had a key to Hoult's apartment and that after Howard drove him back to his residence, he burned his clothes in the fireplace. On Saturday, he thoroughly cleaned Howard's vehicle. On Monday morning,

after police officers had found Hoult's body and he knew they were investigating at his residence, he frantically told Eledge that something bad had happened and that he needed to get out of town. Shortly before trial, he again threatened Howard about testifying against him through a letter he penned.

We conclude that the record in this direct appeal is sufficient to show that Burries was not prejudiced by his attorney's failure to object to the State's inconclusive DNA evidence or his cross-examination of Helligso. There is no reasonable probability that the jury's guilty verdict rested on speculation that Burries' DNA was found in a blood sample taken from Hoult's arm.

### 3. Record Is Insufficient to Address Burries' Remaining Ineffective Investigation Claims

Burries also contends that his trial counsel was ineffective in failing to investigate and obtain favorable evidence from several potential witnesses and in failing to investigate other potential sources of favorable evidence.

Specifically, Burries contends that despite his requests, trial counsel failed to independently investigate, interview, depose, or subpoena each of the following entities and/or potential witnesses: subpoena cell phone location and/or global positioning system data, nor did he obtain all information extracted from Hoult's cell phone in 2014, which would have demonstrated that Howard, Burries, and/or Hoult were not present in the places or at the times offered by the State's theory at trial; subpoena records, receipts, and video from a fast-food restaurant, which would have disproved Howard's testimony regarding her visit to the restaurant at Burries' request on the night of the murder and further disproved the State's theory as to the timeline of the murder; call Burries' brother as a witness, who would have confirmed Hoult's involvement with multiple boyfriends with whom Hoult drank excessively and who subjected Hoult to violence; call Burries' brother-in-law as a witness, who would have testified similarly to Burries' brother,

and who also would have testified that he saw Howard in handcuffs on her front lawn just prior to her interview with police; call Burries' cousin as a witness, who would have testified that police interrogated her and disclosed their motive for maliciously prosecuting Burries—that all the women associated with Burries were scared of him and had been beaten and that it needed to stop; call an acquaintance of Burries as a witness, who would have provided an alibi for Burries at a time when, according to the neighbors' testimony, Burries was arguing with Hoult; subpoena an airline itinerary that would have corroborated Burries' alibi for the time when, according to the neighbors' testimony, Burries was arguing with Hoult in her apartment; call a potential witness who would have provided testimony invalidating the State's witnesses' claims that Hoult had bruising and that Burries had likely caused the bruising; call another potential witness who would testify as to seeing Hoult alive after the time of death according to the State's theory, corroborating a neighbor of Hoult's testimony that Hoult was alive the morning of Friday, May 16, 2014; subpoena records of a hospital which would have disproved Hoult's coworkers' testimony that Hoult did not work Friday, May 16; subpoena Hogan's work and cell phone records which would have disproved Hogan's alibi at the time of Hoult's death and proved that Hogan did have a romantic relationship with Hoult; obtain Hogan's prior criminal record which could have been used in impeachment; subpoena video footage from a bar in Hoult's neighborhood on May 13, which would have disproved the testimony of the State's witnesses; obtain all video footage of Hoult's apartment complex's address between the dates of May 14 and June 14, which would have supported the exculpatory testimony of two potential witnesses; subpoena medical records from Hoult's medical providers, which contained evidence suggesting drug use, supporting the defense's theory that Hoult's involvement in the illicit drug community led to her murder; obtain recordings of inmate calls from the Douglas County Correctional

Center which would have provided support to the defense's theory that someone other than Burries murdered Hoult; call Hoult's aunt, who would have testified as to Hoult's having multiple boyfriends at the time of her murder, at least one of which was potentially dangerous.

Burries further contends that trial counsel failed to act or present evidence during trial when trial counsel knew action was required or evidence should be presented. The following is a list of trial counsel's failures as alleged by Burries: confront a trial witness who was a police investigator with prior, off-the-record, inconsistent statements made to her during her interview with a potential witness who told her that she saw Hoult alive at 2:30 p.m. on Friday, May 16, 2014; make a record and move for replacement of a juror or a mistrial after he learned that one of the jurors had a close association with one of the State's witnesses; make a record and either move for replacement of a juror or a mistrial when the juror repeatedly slept through much of the trial; make a record and object during voir dire to the State's peremptory challenges that the State used those challenges to strike all but one minority juror for race-based reasons; present evidence of Burries' heavy intoxication at the time of his interview with Cahill; file a motion based on the State's violation of *Brady v. Maryland*[48] that occurred when the State refused to turn over exculpatory text messages it obtained during its 2014 extraction of data from Hoult's cell phone; call as a witness a cell phone expert hired by Burries, who would have rebutted the testimony of the State's cell phone experts as to the reasons for the delayed text message between Hoult and Burries on May 16; impeach a trial witness who was a neighbor of Hoult with his prior inconsistent identification of a different man as Burries; introduce Burries' clothing that would have proved, contrary to the State's theory, that he did not burn the clothing he had worn on the night of May 15.

---

[48] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[28,29] When a defendant's appellate counsel is not the defendant's trial counsel, the defendant must raise on direct appeal any claim that the trial counsel provided ineffective assistance, if the issue is known to the defendant or apparent from the record, in order to avoid a procedural bar to raising the claim later in a postconviction proceeding.[49] An appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by a trial counsel when raising an ineffective assistance claim on direct appeal.[50]

[30,31] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[51] The determining factor is whether the record is sufficient to adequately review the question.[52] An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.[53] We will address a claim on direct appeal that a defendant's trial counsel was ineffective only if the record is sufficient to adequately review the question.[54] This principle applies to Burries' claims that his trial counsel should have investigated sources of potentially favorable evidence, and we do not address them here.

### 4. Court Did Not Err in Admitting Evidence of Burries' 2012 Assault of Hoult

Rule 404(2) provides the following:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may,

---

[49] See *Parnell, supra* note 5.

[50] *Betancourt-Garcia, supra* note 17.

[51] *State v. Abejide*, 293 Neb. 687, 879 N.W.2d 684 (2016).

[52] *Id.*

[53] *Id.*

[54] See *Betancourt-Garcia, supra* note 17.

however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[32,33] It should be noted that rule 404(2)'s list of permissible purposes is not exhaustive.[55] Nonetheless, under our decisional law, rule 404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.[56]

In its pretrial order, the court ruled that evidence of Burries' 2012 assault of Hoult was admissible under the inextricably intertwined exception to rule 404(2), because Burries had claimed that the clothes he burned on May 16, 2014, were from the 2012 assault. At trial, however, the court concluded that rule 404 governed the admission of the assault evidence. It overruled Burries' request to limit the jurors' consideration of 2012 assault evidence to determining whether Burries had a motive to murder Hoult. Instead, the court stated it would read rule 404(2) as an instruction to the jury. The State then agreed that all of its intended evidence was relevant to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absen[ce of] mistake or accident."

#### (a) Parties' Contentions

Burries contends that the court committed reversible error when it admitted documentary and testimonial evidence of his 2012 assault of Hoult. He argues that the State's primary purpose for presenting this evidence was to establish that he had a bad character and to suggest that he likely killed Hoult because of his propensity to perpetrate domestic violence. He contends that the court erred in concluding in its pretrial order that the evidence was part of the res gestae of the crime. He argues that the assault occurred 17 months before Hoult's murder and was not closely intertwined with it.

---

[55] See *Parnell, supra* note 5.

[56] See *State v. Perrigo*, 244 Neb. 990, 510 N.W.2d 304 (1994).

Burries also contends that both the prosecutor's arguments to the court for admitting the evidence and the court's instruction to the jury did not comply with our requirements under *State v. Sanchez*[57] for admitting evidence of a defendant's other bad acts under rule 404(2). He argues that the prosecutor offered no purpose for the evidence other than to state it was res gestae evidence and that the court failed to identify a specific purpose for which it would receive the evidence.

The State contends that rule 404 did not apply because the evidence of Burries' 2012 assault of Hoult and Beck's testimony of his past conduct was inextricably intertwined with the charged murder. It argues that this evidence was part of the factual setting of the crime because it showed the following: (1) the increasingly violent nature of Hoult and Burries' relationship; (2) why law enforcement focused on him as a suspect; (3) what Burries meant when he told investigators that he had burned his clothes from the December 2012 assault at Hoult's request; (4) why Hoult sent texts to Burries about his control of her and his threats to torture her, and why she stated that she did not feel safe around him; and (5) what Burries meant when he told Robinson that "he did time once for [Hoult] and he wasn't scared to do it again." The State argues that without Beck's testimony and evidence of Hoult's injuries from the 2012 assault, the jury would believe that despite Hoult's long-term relationship with Burries, she had an "unexplained and unsupported fear of Burries."[58]

### (b) Evidence of Burries' 2012 Assault
### Was Inextricably Intertwined
### With Charged Murder

[34] Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof

---

[57] *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999).

[58] Brief for appellee at 29.

of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.[59]

We have previously explained that our jurisprudence initially adopted a broad concept of this class of evidence.[60] Although in other cases we have partially backed away from the inextricably intertwined exception and instead applied a broader notion of rule 404, the exception is still viable.[61]

The 2012 assault of Hoult was part of the factual setting of her murder in May 2014. During the murder trial, the jury heard testimony that Burries and Hoult had a volatile relationship; that while Burries was in prison for the assault, he would call Hoult and threaten her; that after being released from prison, Burries threatened Hoult on multiple occasions; that prior to the murder, Hoult had injuries consistent with being assaulted; that Burries told Robinson that he had served time in prison for Hoult; and that Burries told Cahill and Eledge that he burned his clothes because they still had blood on them from the last time he assaulted her before he went to prison.

Burries himself repeatedly interjected the 2012 assault of Hoult into the 2014 murder of Hoult. Burries told investigators that Hoult had asked him to get rid of the clothes he had worn during the previous assault, Burries told Eledge that Hoult wanted him to get rid of the clothing from the last time he went to jail, and Burries told Robinson that "he did time once for [Hoult] and he wasn't scared to do it again."

The record supports the trial court's finding that the evidence of the assault was necessary to present a coherent picture of the murder. As a result, we conclude that the trial court did not err in its pretrial ruling that the 2012 assault was part of the factual setting of the crime.

---

[59] See, e.g., *Parnell, supra* note 5.

[60] *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

[61] See *id.*

We are cognizant of the fact that at trial, the court concluded that the admission of Burries' 2012 assault of Hoult was admissible under rule 404(2). However, since we find that the assault evidence was inextricably intertwined and not 404 evidence, we need not consider that ruling.

### 5. COURT DID NOT ERR IN ADMITTING TESTIMONY OF BURRIES' THREATS OF FURTHER ASSAULTS

Burries contends that the court erred by admitting the testimony from Hoult's acquaintances that Burries threatened Hoult while he was incarcerated from December 2012 to November 2013, and after his release from prison. However, in several circumstances, this court has held that evidence of a defendant's threats to a murder or assault victim can be admitted under the inextricably intertwined exception to rule 404.

In *State v. Smith*,[62] the defendant and another man were convicted of shooting two brothers, one fatally, after the brothers cooperated with federal authorities in exchange for more lenient sentencing. We concluded that rule 404 did not apply to evidence that within 30 to 40 days prior to the shootings, one of the defendants' made threatening statements to the brothers on two occasions. We held that the evidence was necessary to present a coherent picture of the crime and was part of the factual setting.

In concluding that the threats were inextricably intertwined with the shootings, we relied on another case involving evidence of a defendant's stated desire to harm or kill a murder victim. In *State v. Canbaz*,[63] the disputed evidence did not involve the defendant's threats to the victim. Instead, after the defendant's girlfriend broke up with him, he told witnesses that he wanted to kill her and her family members, or he made statements that evidenced his desire to kill her. Some of his

---

[62] *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013).

[63] *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000).

statements were made a few days before the murder, but others were made at an unspecified time after the defendant's girlfriend broke up with him in early July. He killed her in early September. We held that rule 404(2) did not govern the admission of the defendant's statements to these witnesses and that the trial court erred in concluding otherwise. Instead, the statements were admissible as evidence that the defendant had killed intentionally and with premeditation.

More recently, in *State v. Parnell*,[64] the defendant shot two women multiple times, killing one of them. The woman who survived described the defendant's vehicle, which she had previously seen. She testified that 2 days before the shooting, the defendant had threatened her with a gun because she had brought a rival gang member to a party. He was prosecuted and convicted of making a terroristic threat before the State tried him for shooting the women. The State filed notice that it intended to present evidence of the terroristic threat under rule 404 to show his motive, intent, and plan. After a pretrial hearing, the trial court ruled that the threat was inextricably intertwined with the shooting but would have also been admissible under rule 404. We affirmed the court's ruling that the inextricably intertwined exception applied. We reasoned that evidence of the threat was necessary to present a coherent picture of the crimes because it showed that he had acted upon a recent threat to the victim.

[35] Under this precedent, evidence of a murder defendant's previous threat to the victim or statement to others showing a desire to harm or kill the victim are facts that are inextricably intertwined with the charged murder if the defendant made the threat or statement fairly close in time to the murder.[65]

Accordingly, the inextricably intertwined exception applied to Beck's testimony that she overheard threats from Burries

---

[64] *Parnell, supra* note 5.

[65] See *id.*

in his calls to Hoult while he was incarcerated. Though these threats were made at least 6 months prior to the murder, the threats were relevant to show that Burries killed Hoult intentionally or with premeditation or that he had acted on a recent threat to harm or kill Hoult.

The inextricably intertwined exception applied to Robinson's testimony of hearing Burries' statement about doing time for Hoult in April. It also applied to Robinson's testimony of seeing Hoult upset after getting a call from Burries in May. Further, it applied to Hoult's statement to Robinson shortly after that call about the threats made to her by Burries.

The inextricably intertwined exception applied to Coburn's testimony that about a month before Hoult's murder, he also heard Burries threaten Hoult.

Because Burries' threats prior to the murder were inextricably intertwined with the murder, the court did not err in failing to comply with the procedural requirements for admitting evidence under rule 404 and failing to properly instruct the jury on the specific purpose for which it was receiving the testimony.

As we discuss later, we reject Burries' argument that the State failed to prove by clear and convincing evidence that Burries, and not someone else, had threatened Hoult. There was ample evidence that Burries was known as "Tony." These witnesses testified to hearing threatening statements in calls from "Tony" to Hoult, or Hoult told them that "Tony" had threatened her after speaking to him on her cell phone.

### 6. COURT ERRED IN ADMITTING BURRIES' THREATENING LETTER TO HOWARD

#### (a) Additional Facts

Burries' letter to Howard was presented to the court during the trial because Howard gave it to the prosecutor when she appeared to testify. During an in camera hearing, the State argued that the letter was relevant because Burries' intimidating statements to Howard bordered on witness tampering. The

prosecutor stated that if the court ordered a redaction, she would comply. But she felt strongly that the entire letter should be admitted. Defense counsel did not believe the letter was admissible at all but stated that the defense would consider a redacted version after seeing it. The court agreed with the prosecutor and admitted the entire letter.

Before the letter was read to the jury, the court instructed the jury as follows:

[S]ome of the evidence you are about to receive is — evidence of other crimes, wrongs or acts is not admissible to prove the character of a person or in order to show that he or she is acting in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

### (b) Parties' Contentions

Burries contends that the court erred in admitting the entire letter because portions of the letter were not relevant for any purpose other than proving that he had a bad character. He also contends that the court erred in reciting potential purposes under rule 404(2) per the letter, instead of providing the jury with a precise purpose for which the court was admitting the evidence. The State responds that Burries did not ask for a redaction and that even if he had, the unredacted portions would have been the most probative of his consciousness of guilt. Relying on *State v. Jenkins*,[66] the State also argues that Burries' letter was not subject to rule 404 and that it was highly probative of his consciousness of guilt.

### (c) Resolution

We disagree with the State that Burries' attorney should have requested a redaction when the prosecutor offered to redact the letter and the court determined that the entire letter was admissible under rule 404. However, as the State argued,

---

[66] *State v. Jenkins*, 294 Neb. 475, 883 N.W.2d 351 (2016).

the unredacted portions would have been the most probative of his consciousness of guilt and the admission of the remaining portions of the letter was harmless error.

We also disagree with the State that under *Jenkins*, Burries' letter to Howard was not subject to rule 404. In *Jenkins*, the defendant was convicted of first degree murder. Sometime after the murder, the defendant got into a heated argument with her mother. When her brother took the defendant into a different room, her sisters heard her yell that she would "'pop that bitch like I popped that nigga.'"[67] We concluded that in the context of witnesses' testimonies, the jurors could have reasonably inferred that she had threatened to shoot her mother, just like she had shot the victim. We concluded that her statement was an admission, which was not subject to exclusion under rule 404(2), because it was direct evidence of the charged crime. But Burries did not admit to killing Hoult in his letter to Howard, so *Jenkins* does not control here.

[36] However, we do agree with the State that Burries' letter to Howard was intended to threaten her on the eve of her testimony. This court has held that "[a] defendant's attempted intimidation or intimidation of a State's witness is evidence of the defendant's 'conscious guilt' that a crime has been committed and serves as a basis for an inference that the defendant is guilty of the crime charged."[68]

In *State v. Clancy*,[69] evidence was presented that the defendant had called a woman and threatened to kill her or her husband or to blow up their house if the woman provided further information to law enforcement authorities. We held that evidence of a threatening communication to a witness had probative value and was admissible as relevant evidence if it

---

[67] *Id.* at 480, 883 N.W.2d at 357.

[68] *State v. Clancy*, 224 Neb. 492, 499, 398 N.W.2d 710, 716 (1987), *disapproved on other grounds, State v. Culver*, 233 Neb. 228, 444 N.W.2d 662 (1989).

[69] *Id.*

allowed a reasonable juror to believe that it was more probable that the declarant was conscious or knew that a crime had been committed.[70]

As such, Burries' letter to Howard was relevant to show his consciousness of guilt.[71] Though neither the prosecutor nor the court stated this purpose, the court acknowledged that portions of the letter were relevant to show Burries' threats to a witness.

However, we also held in *Clancy* that consciousness of guilt evidence is subject to rule 404(2).[72] As a result, evidence of Burries' letter to Howard was subject to the same procedural requirements as other evidence offered under rule 404(2).

[37] Pursuant to rule 404(3), before the prosecution can offer evidence of a criminal defendant's extrinsic acts under rule 404(2), it must first prove to the trial court, by clear and convincing evidence and outside the jury's presence, that the defendant committed the act.[73]

[38-40] Upon objection to evidence offered under rule 404(2), the proponent must state on the record the specific purpose or purposes for which the evidence is being offered, and the trial court must similarly state the purpose or purposes for which it is receiving the evidence.[74] A trial court must then consider whether the evidence is independently relevant, which means that its relevance does not depend upon its tendency to show propensity.[75] Additionally, evidence offered under rule 404(2) is subject to the overriding protection of rule 403, which requires a trial court to consider whether the probative value of the evidence is substantially outweighed

---

[70] *Id.*

[71] See *id.*

[72] See *id.*

[73] See *Jenkins, supra* note 66.

[74] See, e.g., *id.*; *State v. Torres*, 283 Neb. 142, 812 N.W.2d 213 (2012).

[75] See, *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016); *State v. McGuire*, 286 Neb. 494, 837 N.W.2d 767 (2013).

by the danger of unfair prejudice.[76] Finally, when requested, the trial court must instruct the jury on the specific purpose or purposes for which it is admitting the extrinsic acts evidence under rule 404(2), to focus the jurors' attention on that purpose and ensure that it does not consider it for an improper purpose.[77]

In *Sanchez*, we agreed with the reasoning of federal courts under their counterpart to rule 404(2) that a fine line often exists between what is admissible and inadmissible evidence under this rule because such evidence can sometimes carry a substantial danger of unfair prejudice. "'Therefore, it is advisable for a trial judge to insist that a party offering [extrinsic acts] evidence place on the record a clear explanation of the chain of inferences leading from the evidence in question to a fact "that is of consequence to the determination of the action."'"[78]

[41] A proponent's clear explanation for evidence offered under rule 404(2) ensures that a trial court has an opportunity to examine the evidence for its independent relevance and the potential for unfair prejudice. The requirement that the trial court state on the record the purpose or purposes for which such evidence is received is primarily to ensure that an appellate court can review the trial court's ruling.[79] The requirement that the court give the jury a limiting instruction upon request ensures that the jury does not focus on the evidence for an improper purpose.[80]

In the instant case, the court's limiting instruction did not instruct the jury on the specific purpose or purposes for which the letter was being admitted. Instead, it instructed the jury

---

[76] See, *Pullens, supra* note 10; *Perrigo, supra* note 56.

[77] See, *Oldson, supra* note 75; *Torres, supra* note 74.

[78] *Sanchez, supra* note 57, 257 Neb. at 307, 597 N.W.2d at 374, quoting *U.S. v. Murray*, 103 F.3d 310 (3d Cir. 1997).

[79] See *id.* Accord *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767 (2011).

[80] See *Oldson, supra* note 75.

that the evidence "*may* . . . be admissible for other pur-
poses, such as proof of motive, opportunity, intent, preparation,
plan, knowledge, identity or absence of mistake or accident."
(Emphasis supplied.)

The court's instruction allowed the jury to consider the let-
ter for any purpose under rule 404(2) instead of considering it
for Burries' conscious guilt for the crime charged, exclusively.
As a result, the court's admission of the letter was error.

### 7. Court Properly Admitted Evidence of Burries' and Hoult's Statements to Robinson

Although we have concluded that Robinson's testimony
about Burries' threatening statements to Hoult were inextri-
cably intertwined with the charged crime, Burries argues that
the court erred in failing to exclude his testimony under other
evidence rules.

### (a) Additional Facts

As previously mentioned, Robinson testified that about the
middle of April, he answered a call on Hoult's cell phone and
saw the name "Tony" on it. Robinson believed that he was
speaking to Burries. Robinson said that after asking where
Hoult was, the caller said that "he did time once for [Hoult]
and he wasn't scared to do it again." The court overruled
Burries foundation objection to this testimony. In its pretrial
order, the court explained its ruling:

> [Robinson] can testify as to what he saw and observed
> even though he cannot testify that the caller actually was
> [Burries]. This is no different from a fact witness testify-
> ing that he saw a particular make/model/color of car in a
> parking lot without . . . being able to specifically iden-
> tify it as belonging to a Defendant. The evidence is still
> admissible even though it is subject to weight and cred-
> ibility considerations.

Robinson also testified that on Monday, May 12, 2014,
Hoult told him "Tony" was calling and that he overheard

part of the conversation and saw Hoult become distressed and emotional. He stated that about 20 to 30 minutes later, she told him that "Tony" had threatened to beat her, revive her, and beat her again. The court overruled Burries' hearsay objections to Robinson's testimony that Hoult told him "Tony" was the caller and that Hoult told him that "Tony" had said he would beat her. In its pretrial order, the court ruled that Hoult's statements to Robinson on May 12 were admissible under three hearsay exceptions: the excited utterance exception, the state-of-mind exception, and the residual exception.

(b) Foundation Challenge to
Robinson's Testimony
Regarding Burries' Call
to Hoult in April 2014

Burries argues that the court erred in rejecting his foundation challenge because Robinson could not know that Burries was the person calling Hoult in April 2014 when he saw the name "Tony" on Hoult's cell phone. He argues that despite the court's ruling that Robinson could not identify Burries as the caller, it permitted him to testify that he believed the caller was Burries.

First, we reject Burries' interpretation of the court's order. The court meant that Robinson could testify to what he saw on Hoult's cell phone—i.e., the name "Tony"—even if Robinson could not positively know whether Hoult had assigned the name "Tony" to calls that she received from Burries' cell phone number. It did not preclude Robinson from testifying that he believed the caller was Burries. It ruled that the evidence was admissible even though it was subject to weight and credibility considerations.

[42-44] Second, we reject Burries' authentication argument. Neb. Evid. R. 901[81] requires authentication or identification of

_____

[81] Neb. Rev. Stat. § 27-901 (Reissue 2016).

evidence sufficient to support a finding that a matter is what the proponent claims as a condition precedent for admission. But authentication or identification under rule 901 is not a high hurdle.[82] A proponent is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity.[83] If the evidence is sufficient to support a finding that the evidence is what it purports to be, the rule is satisfied.[84] And we have held that the identity of a participant in a telephone conversation may be established by circumstantial evidence such as the circumstances preceding or following the telephone conversation.[85] Many other courts hold the same.[86]

The State did not submit records of the cell phone calls that Hoult received in April 2014. But at that time, her cell phone was programmed to identify the caller as "Tony." As stated, ample evidence in the record established that Burries was known as Tony. The record also showed that Robinson knew Hoult had a boyfriend named "Tony" and that on May 12, 2014, he heard "Tony" speaking to Hoult on her cell phone in a threatening manner. It would have been an implausible coincidence if Hoult had known two different males named "Tony" who called her to make threats. Equally important, on redirect examination, Robinson testified that he recognized the voice he heard on May 12—when Hoult identified the caller as "Tony"—as the same voice that he had heard when he answered Hoult's cell phone in April. We conclude that the circumstantial evidence sufficiently established that Burries was the "Tony" who called Hoult's cell phone in April and spoke to Robinson.

---

[82] See, e.g., *Casterline, supra* note 11.

[83] *Id.*

[84] *Id.*

[85] See *State v. McSwain*, 194 Neb. 31, 229 N.W.2d 562 (1975).

[86] See Annot., 79 A.L.R.3d 79 (1977 & Supp. 2017).

#### (c) Hearsay Challenge to
#### Robinson's Testimony
#### About May 12, 2014,
#### Call From Burries

Burries contends that the court erroneously ruled that Hoult's statements to Robinson on May 12, 2014, were admissible under residual hearsay exception or under the exceptions for excited utterances and to show the declarant's state of mind. The State argues that Burries' statements to Hoult were admissible as the statement of a party opponent and that Hoult's statements to Robinson were admissible as excited utterances. Regarding the excited utterance exception, Burries argues that Hoult did not tell Robinson about Burries' threats to beat her until 20 to 30 minutes after Robinson observed her change in demeanor during the call. He also suggests that Hoult was not upset by the time she made the statement because Robinson testified that she "'just needed someone to vent to.'"[87]

[45,46] Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted.[88] A declarant's out-of-court statement offered for the truth of the matter asserted is inadmissible unless it falls within a definitional exclusion or statutory exception.[89]

[47] Under Neb. Evid. R. 803(1),[90] the rule against hearsay does not exclude a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." This exception comprises excited utterances.[91]

---

[87] Brief for appellant at 27.

[88] Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 2016).

[89] See, Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 2016); *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011).

[90] Neb. Rev. Stat. § 27-803(1) (Reissue 2016).

[91] See, e.g., *Smith, supra* note 62.

[48] Excited utterances are an exception to the hearsay rule, because the spontaneity of excited utterances reduces the risk of inaccuracies inasmuch as the statements are not the result of a declarant's conscious effort to make them.[92] The justification for the excited utterance exception is that circumstances may produce a condition of excitement which temporarily stills the capacity for reflection and produces utterances free of conscious fabrication.[93]

[49,50] For a statement to be an excited utterance, the following criteria must be met: (1) There must be a startling event, (2) the statement must relate to the event, and (3) the declarant must have made the statement while under the stress of the event.[94] An excited utterance does not have to be contemporaneous with the exciting event.[95] An excited utterance may be subsequent to the startling event if there was not time for the exciting influence to lose its sway.[96] The true test for an excited utterance is not when the exclamation was made, but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event.[97]

[51] The period in which the excited utterance exception applies depends on the facts of the case.[98] Relevant facts include the declarant's physical conditions or manifestation of stress and whether the declarant spoke in response to questioning.[99] But a declarant's response to questioning, other than questioning from a law enforcement officer, may still be an

---

[92] *State v. Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016).

[93] *Id.*

[94] *Id.*

[95] See *State v. Hale*, 290 Neb. 70, 858 N.W.2d 543 (2015).

[96] *Id.*

[97] *Britt, supra* note 92.

[98] *Hale, supra* note 95.

[99] See *id.*

excited utterance if the context shows that the declarant made the statement without conscious reflection.[100]

The record does not show the lapse of time from when Hoult ended her conversation with Burries and when Robinson saw her outside. Robinson testified that Hoult was still on the cell phone with Burries when he and Hoult's other guests went outside because "it was getting inappropriate for a child to be in the room." He said he saw Hoult 20 to 30 minutes later when she came outside. But she could have been on her cell phone with Burries until just before she appeared outside.

Moreover, Robinson's statement that Hoult "just needed someone to vent to" showed only that Hoult spoke voluntarily, as distinguished from responding to questioning. It did not show that Hoult was no longer speaking under the influence of nervous excitement and shock because of Burries' threats. Robinson specifically testified that Hoult came outside with tears in her eyes. We conclude that the court did not err in admitting Hoult's statement to Robinson under the excited utterance exception. Because we reach this conclusion, we do not consider the court's rulings that the statement was admissible under other hearsay exceptions.

### 8. BURRIES FAILED TO PRESERVE ERROR REGARDING COBURN'S TESTIMONY ABOUT HOULT'S STATEMENTS TO HIM

Burries contends that Coburn's testimony was inadmissible for other reasons, despite our conclusion that it was inextricably intertwined with the charged murder. Coburn testified that on the Sunday before Hoult was killed, he checked her apartment, because Hoult wanted him to make sure that Burries was not inside. After Coburn assured Hoult that Burries was not there, she gathered some clothes to stay at a friend's

---

[100] *Id.*

house. But when her friend did not come, Coburn took Hoult back to her apartment and made sure she was locked inside. Burries did not object to Coburn's testimony.

Burries argues that the court erred in its pretrial ruling that (1) Hoult's statements to Coburn were admissible under the residual hearsay exception and under exceptions for excited utterances and present sense impressions and (2) the testimony was relevant to show Hoult was avoiding Burries and the volatility of their relationship was escalating just before Hoult's murder. The State contends that Burries did not timely object to this testimony. Alternatively, the State argues that Coburn's testimony was relevant to show Hoult's fear of Burries and not offered to prove the truth of the matter asserted.

[52,53] A motion in limine is a procedural step to prevent prejudicial evidence from reaching the jury.[101] Normally, when a motion in limine to exclude evidence is overruled, to preserve error for appeal, the movant must renew the objection when the particular evidence which was sought to be excluded by the motion is offered during trial.[102] We recognize that the court allowed Burries to have a standing objection to its pretrial rulings under rule 404. But it did not give Burries a standing objection to its pretrial rulings under any other rule of evidence. Accordingly, because Burries failed to object to Coburn's testimony at trial, he did not preserve his claimed errors for appeal.

### 9. BURRIES FAILED TO PRESERVE ERROR REGARDING ANOTHER OF HOULT'S NEIGHBOR'S TESTIMONY ABOUT OVERHEARING ARGUMENTS

Another of Hoult's neighbors testified that she would often hear loud arguments between Hoult and a male or Hoult

---

[101] *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013).

[102] See *id.*

and a female. She thought that the last time she heard yelling between Hoult and a male was on the Wednesday or Thursday night before Hoult was killed. But she could not identify the male who had argued with Hoult because she never saw anything.

Burries contends that this testimony lacked foundation because she could not identify the male voice and that her testimony posed a high potential for unfair prejudice because Hoult could have been arguing with another person. However, the record shows that Burries failed to object to the neighbor's testimony at trial. So, we again conclude that he did not preserve his claimed error for appeal.

### 10. Court's Improper Admissions of Burries' Letter to Howard Was Harmless Error

[54-56] In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the error was harmless beyond a reasonable doubt.[103] Harmless error review looks to the basis on which the jury actually rested its verdict. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.[104] The erroneous admission of evidence is generally harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[105]

As stated, the court erred in admitting evidence of the letter that Burries wrote to Howard shortly before the trial to show his consciousness of guilt. Although the letter was admissible for that purpose, the court's jury instruction was erroneous.

---

[103] *State v. Rask*, 294 Neb. 612, 617, 883 N.W.2d 688, 693 (2016).

[104] *Draper, supra* note 8.

[105] See *State v. Williams*, 295 Neb. 575, 889 N.W.2d 99 (2017).

But the jury heard cumulative, and much stronger, evidence of his consciousness of guilt that was properly admitted.

Specifically, Howard testified that after she drove Burries away from Hoult's apartment, he had her stop in front of a randomly chosen house and screamed at her that she would be an accessory if she told anyone that he had been at Hoult's apartment that night. An innocent person would not have referred to Howard as an accessory or threatened her with criminal liability for reporting his whereabouts on the night Hoult was killed. Immediately after this statement, Burries had Howard drive across a bridge where he threw something out the window. Howard testified that she complied with his orders that night because she was afraid of what he might do to her. This evidence firmly established that Burries had attempted to intimidate Howard into silence and that she was afraid he would harm her.

Given the strength of the State's properly admitted evidence, we conclude that the jury's guilty verdict was surely unattributable to the court's error.

## VI. CONCLUSION

We conclude that the court erred in admitting evidence of Burries' letter to Howard without complying with the procedural requirements for admitting such evidence under rule 404(2). But we conclude that because the State's other evidence of Burries' guilt was overwhelming, the court's error was harmless beyond a reasonable doubt. As a result, we affirm.

Affirmed.