IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. SMITH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

RONNIE S. SMITH, APPELLANT.

Filed April 16, 2019.    No. A-18-461.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

After a jury trial, Ronnie S. Smith was convicted of second degree forgery, $5,000 or more. The Lancaster County District Court found Smith to be a habitual criminal and sentenced him to 10 to 15 years' imprisonment. On appeal, Smith challenges his conviction and asserts that his trial counsel was ineffective. We affirm.

## II. BACKGROUND

### 1. PRETRIAL PROCEEDINGS

In a filing to the county court for Lancaster County in March 2017, the State charged Smith with second degree forgery ($5,000 or more) based on allegations regarding checks drawn on a bank account belonging to "Ed Erdman" (Ed) from August 25 to November 3, 2016. In May 2017, Smith was bound over to the district court where the State filed an information charging Smith as

it had in county court. The State later filed an "Amended Information" to add an allegation that Smith was a habitual criminal pursuant to Neb. Rev. Stat. § 29-2221 (Reissue 2016). Each party filed pretrial motions in limine, and Smith raised another pretrial motion that he ultimately withdrew; none of which are relevant to this appeal.

## 2. TRIAL

Trial began on March 8, 2018. On March 13, during the defense's case-in-chief, the State filed an "Amended Amended Information," changing only the alleged timeframe for its claim that Smith drew checks on Ed's account; the timeframe was now alleged to be October 7 to November 30, 2016. During trial, each party adduced evidence, some of which is not pertinent to issues on appeal (e.g., store employees testified about video surveillance; police officer testified about his investigation; Ed's neighbor's testimony). Evidence relevant to the appeal is set forth below.

### (a) Relationships Among Primary Witnesses

Sharon Johnson (Sharon) and Ed indicated they were previously married but were divorced during all times relevant to this case. Sharon still kept "in touch with him somewhat" as they share "grandkids and great-grandkids." Sharon and Ed had two sons together, one of whom was Lance Erdman (Lance). Sharon indicated that Lance had five children, including Brandon Erdman and Sonya Sharp (Sonya). Sonya testified that Lance was her father.

Smith testified that his address was an apartment on North 70th Street, that Lance was his neighbor, and they had known each other for 4 years. After getting to know Lance, they "spent quite a bit of time together." Ed testified that he had stayed in Lance's apartment on North 70th Street for at least 2 years. Sharon agreed that Ed had been staying with Lance for a couple of years because Ed's house was in disrepair and Lance was taking care of Ed. Ed said he had been working for a company since 1989. Smith knew Lance was unemployed for as long as he had known Lance. Sometime "way before" Lance's hospitalization (discussed below), Ed met Smith through Smith's "acquaintance" with Lance. Sharon and Sonya first met Smith when Lance was in the hospital.

### (b) Lance's Hospitalization and Death

Smith testified that he spoke to Lance on October 7, 2016, and "could tell that his health was declining." The next day, Smith went to check on him and saw blood on the garbage can by Lance's bed and on the floor. Lance's balance "was not there." Smith called "9-1-1." The rescue squad transported Lance to the "'ER,'" and Smith followed them to the hospital in his own vehicle. On arrival, Smith and Lance spoke "about someone looking after [Ed]." At some point, Smith left to go eat and returned to find Lance had been moved to a different area. Smith located Lance, who "was unconscious" with a tube down his throat.

Ed recalled that after Lance went to the hospital, he saw him around October 9, 2016. Sharon and Sonya found out Lance was in the hospital that same day; Sharon thought she first visited Lance on October 10, and Sonya went to see Lance on October 11. Ed, Sharon, and Sonya all indicated that Lance initially had a tube down his throat and could not talk. Sharon said that during the "first few days," Lance was in a medically-induced coma. Ed, Sharon, and Sonya generally related that at some point, Lance was conscious; Sonya said that even then, Lance was

still intubated and could not speak. Lance's family members generally testified that once Lance could communicate, it was limited. Ed "would talk to [Lance] and then [Lance] would nod his head either yes or no." Sharon described that Lance "would make sounds" but she could not understand them. Sonya said that she never heard Lance express a coherent thought and that Lance was not able to write things down. Lance died on October 27.

### (c) Smith's Return of Some of Lance's Belongings

Smith recalled that when he met Sonya he told her that he had some of Lance's "stuff." He remembered he had Lance's computer, apartment and mailbox keys, truck keys, car keys, cell phone, and credit card. Sonya said that when she first met Smith, he told her that he had Lance's computer, cell phone, keys, and wallet.

Sharon said she received a text from Smith around November 9, 2016, in which Smith said he left Lance's keys and wallet on the table in Lance's apartment; Sharon had asked that those items be returned. About "a day or two" later, Sharon went to the apartment and found the items. Smith disputed that he initially had Lance's wallet and said he only took one of Lance's credit cards; but, Smith also said "[s]omething happened" and he "had to go get [Lance's] wallet." Exhibit 19 shows that on November 10, Smith texted Sonya that he had returned "the keys" to Lance's apartment table but still had "one key to the apartment." Sonya responded that she would come get the "apt and mailbox key."

### (d) Ed's Bank Account

#### (i) History of Additional Account Holders

Ed testified about his bank checking account. The parties stipulated that exhibits 12, 22, and 23 were true and accurate copies of signature cards issued and maintained by Ed's bank in the ordinary course of business for Ed's account. Lance used to be on Ed's account "in case anything that [sic] ever happened" to him so that "[Lance] could take care of the final arrangements." Exhibit 22 shows Ed and Lance listed as account holders of a checking account as of 2013. Once Lance was on the account, Ed had some checks made with Lance's name on them. Later, Ed no longer wanted Lance on his account as Lance "was delinquent in child support" and money was being drawn out of Ed's account because Lance was a joint account holder on it. Exhibit 23 shows that Lance's name was removed from the account in 2014. After that, Ed "gave [Lance] authorization to pay the rent and so forth" but Lance did not have authority to write checks without asking Ed first. Exhibit 12 shows that on October 26, 2016 (1 day before Lance died), Ed added Sharon as an account holder on his account. Ed asked Sharon if she would be on his account "in case something would happen" to him. Sharon said Ed sometimes needed to be reminded of when bills were due.

#### (ii) Sharon's Discovery of Certain Checks Drawn on Ed's Account

Sharon first viewed Ed's account (through online banking) around November 8 or 9, 2016. She could view actual checks, and "some checks that were fairly large" caught her attention. Sharon testified that the following checks caused her concern. Dated October 15, exhibit 4 (check 4479) is paid to the order of "Ronnie Smith" for $1,500. Dated October 17, exhibit 5 (check 4478)

is paid to the order of a credit union for $1,500 and exhibit 7 (check 4476) is paid to the order of Lincoln Electric System (L.E.S.) for $62.04. Sharon said that Lance was in the hospital on a respirator on October 15 and 17. Dated November 2 (after Lance's death), exhibit 6 (check 4338) is paid to the order of a credit union for $2,500. Sharon indicated that checks 4478 and 4338 were paid on Lance's credit union account. All the checks were signed in Lance's name, which concerned Sharon as Lance "was unable to sign checks."

About November 10 or 11, 2016, Sharon called her "other son" and asked to have Ed call her back, and he did. Sharon recalled she asked Ed "if he knew about those checks and he did not." Ed generally testified that was when he became aware of the checks and that he did not write or authorize the four checks (exhibits 4 to 7) to be written. Thereafter, on a telephone call with Smith, Sharon asked Smith if he "knew anything about four checks that were signed by Lance." Smith apparently admitted that he wrote the checks. Sharon then told Smith that she did not understand how Smith "could do that" when Lance was "not even on that account." Sharon told Smith that "was Ed's account, that was Ed's money." According to Sharon, Smith told her that he had taken the checks out of Lance's apartment. Both Sharon and Smith testified that Smith also told her that Ed knew he was writing those checks; Smith recalled Sharon disagreed with that.

The parties stipulated that exhibits 8 and 9 were true and accurate copies of the business records of Ed's bank on Ed's account showing all transactions upon it, compiled as a bank statement covering certain periods (collectively, from September 23 to November 22, 2016).

### (iii) Circumstances of Smith's Writing of Four Checks

During trial, Smith admitted that he wrote each of the four checks (exhibits 4 to 7) and signed Lance's name to them. According to Smith, he wrote check 4479 ($1,500) to himself because he planned to clean Lance's apartment. Smith and Terri Watson, Smith's girlfriend at the time, indicated that Smith paid Watson $300 total for Watson to clean Lance's apartment and Ed's house. They claimed Watson cleaned the apartment with Smith's help but admitted Watson never cleaned Ed's house. Smith planned on getting a dumpster but never ended up having any delivered. Sharon indicated she knew of Smith's plans to get a dumpster and clean the apartment with help from his church friends. Sharon did not know Smith intended to pay for those things with Ed's bank account. At some point, Ed confronted Smith about that check, and the conversation was that "[Smith had] written a check, and [Ed] wanted [his] money back."

Smith wrote check 4478 for Lance's credit card because "there was a bill in the stack" on Lance's or Ed's desk. Smith decided he was "going to pay the bills because Lance had always paid the bills." Smith recalled that in Lance's apartment on October 8, 2016, in the medical team's presence, he and Lance talked about "how and who was going to take care of [Ed]" before the rescue squad took Lance "away." Smith agreed that he wrote the check to the credit union because Lance asked him to take care of his bills. Smith claimed Lance also told him to take care of Ed by using Lance's credit card. Exhibit 21 is Lance's credit union statement from October 2 (last statement sent before Lance's death); Smith recognized exhibit 21 and said he paid $1,500 of the balance due ($4,053.30). When asked why he did not pay the full balance, Smith answered that he "didn't know how much money was in [Ed's] account." Exhibit 15, Lance's credit union statement

from November 2, reflects a $1,500 payment was posted to Lance's credit union account on October 21.

Smith said he wrote check 4476 to L.E.S. because Ed and Lance were living there and the bills had to be paid. The parties stipulated that (1) L.E.S. provided electricity for Lance's apartment and generated a bill to Lance dated October 3, 2016, for $62.04 on which payment was due on or before October 28; (2) exhibit 11 was a true and accurate copy of the business record of L.E.S. for that billing period; and (3) payment was made on that bill via check 4476 drawn on Ed's account and as presented and paid on that account on October 24 (shown on exhibit 8). Ed said he never asked Smith to pay the electric bill nor did Smith inform Ed that Smith was going to write a check on Ed's account to pay that bill. Smith claimed that he let Ed know that he was paying the bills on October 30. But Ed indicated that Smith never told him he was going to take care of bills or write checks.

Smith wrote check 4338 ($2,500 check to credit union dated November 2, 2016; Lance died October 27) to "pay the credit card off." He said that when he wrote this check he knew how much was in Ed's account. Exhibit 15 shows Lance's credit union account balance was $4,932.09 as of November 2, 2016; check 4338 was payable to the credit union for $2,500. Smith knew there was enough to pay the credit card bill in full, but could not explain why he did not do so when he wrote the check. Exhibit 16, Lance's credit union statement from December 2, shows $2,500 posted to Lance's credit union account on November 7.

### (e) Lance's Credit Card

#### (i) Sonya's Review of Lance's Credit Union Account Statements

Once Sonya obtained Lance's mailbox key, she was able to get the mail that had been sent to Lance while he had been in the hospital and after he died. She found credit union statements (exhibits 15 and 16). The parties stipulated that exhibits 15 and 16 were true and accurate copies of business records of Lance's credit union account showing all account activity within certain periods (as to exhibit 15, October 3 to November 1, 2016; as to exhibit 16, November 1 to December 2). What caught Sonya's attention in reviewing those statements was that charges "were made on [Lance's] account when [he] was in the hospital and after he died." Sonya indicated that all entries on exhibit 15 starting from October 8 and all entries on exhibit 16 caused her concern. Sometime after, Sonya contacted the police.

#### (ii) Smith's Explanations for Using Lance's Credit Card

Smith indicated that on October 8, 2016, "in front of the rescue squad," Lance directed Smith to open Lance's wallet and take one of his credit cards. According to Smith, Lance specifically told him to use Lance's credit card to take care of Ed. Smith did not give Lance's credit card back to the family because "it wasn't theirs, and [Lance] asked [Smith] to take care of [Ed]." Smith claimed that after Lance went to the hospital, Smith began to do things such as prepare Ed's meals and drive Ed to the hospital. Ed said Smith brought him food "at least five or six times" while Lance was hospitalized, but he never asked Smith to do that and the amount of items brought to him were not worth $1,500.

Smith admitted he used Lance's credit card for most of the charges shown on exhibit 15, starting on October 9, 2016. The State asked Smith about the credit card charges on exhibits 15 and 16. Generally, for the charges he remembered, Smith indicated that some charges were for food or other things for Ed, some charges were for food or drinks for Ed and himself and/or Smith's children, some charges were for Smith's children (e.g., charges at an art museum and a family entertainment center), and some charges were only for Smith (e.g., a charge at an adult novelty store; charges for gas, clothing, and a painting). Smith said the charges at the family entertainment center were because his children helped out with Ed. Smith bought things for himself because he took care of Ed, and Smith "didn't have anything," so he thought "this would be a nice gift" for himself. He claimed a charge at an electronics store was for a sound bar for Ed's "hearing problem," but Sonya testified that there was no sound bar in the apartment. Smith said he stopped using the credit card around November 8 or 9, about when Sharon confronted him about the checks.

### 3. Verdict and Sentencing, Motion for New Trial, and Appeal

On March 15, 2018, the jury returned its verdict finding Smith guilty of second degree forgery as to each check, 4338, 4476, 4478, and 4479, with the face value of each check constituting proceeds wrongfully procured or intended to be procured. The jury found that more than one check was part of the same scheme or course of conduct taking place on or between October 7 and November 30, 2016, in Lancaster County, Nebraska, and that the aggregate amount of proceeds wrongfully procured or intended to be procured by the use of the checks was $5,562.04. The district court accepted the jury's verdict and findings as set forth on the verdict form.

On March 22, 2018, Smith filed a motion for new trial in the district court; Smith states in his appellate brief that this motion was overruled (our record does not contain the court's disposition of this motion). On April 16, the district court found Smith to be a habitual criminal and sentenced him to a mandatory minimum of 10 years and not more than 15 years' imprisonment, with credit for 32 days of time served.

Smith appeals.

## III. ASSIGNMENTS OF ERROR

Smith claims, restated, that (1) the district court erred in admitting testimony regarding his use of Lance's credit card, (2) the evidence was insufficient to support his conviction, and (3) his trial counsel was ineffective.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Savage*, 301 Neb. 873, 920 N.W.2d 692 (2018). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Savage, supra.*

An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), or under the inextricably intertwined exception to the rule. See *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017). An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on relevance, whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, and the sufficiency of a party's foundation for admitting evidence. *Id.*

When reviewing a criminal conviction for sufficiency of the evidence, it does not matter whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finders of fact. *State v. Savage, supra*. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *Id.*

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. ADMISSIBILITY OF EVIDENCE

Smith claims that admitting evidence of his use of Lance's credit card was erroneous. When questioning Sonya about exhibit 15, the credit union statement, the State asked, "is it possible [Lance] could have used his card on the 8th before he got ill?" Sonya answered affirmatively. The State began its next question, "So let's concentrate from the 9th on," at which point Smith's trial counsel asked the court if counsel could approach.

At the bench, Smith's trial counsel stated:

[W]e've got a 404 objection on this and a relevance [objection]. [Smith] is not charged with any kind of credit card fraud . . . the insinuation here is that [Smith] was using the card without anybody's permission to do so after [Lance] had gone into the hospital and/or died. This is 404 material and we need to have a hearing outside the presence of the jury to determine if [Smith] actually did use the card.

The State responded, "it's not 404, it's inextricably linked." The State said, "the credit card was running up charges while it was in [Smith's] possession. And it's reflected on the documents that are already in evidence . . . then he . . . wrote checks to pay off that [credit] card." The district court agreed that the evidence was inextricably linked and overruled Smith's objection.

On appeal, Smith argues the district court abused its discretion in not examining the evidence's admissibility under "Evidence Rule 404." Brief for appellant at 26. He disputes the evidence in dispute was inextricably linked to the forgery.

Section 27-404(2) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The rule's list of permissible purposes is not exhaustive. See *State v. Burries, supra*. Nonetheless, § 27-404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. *State v. Burries, supra*. Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime. *State v. Burries, supra*. See, also, *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006) (what matters is whether evidence is so closely intertwined with charged crime that it completes story or provides total picture of that crime).

The evidence established Smith's use of Lance's credit card starting from about the time Lance was hospitalized until days after Lance's death. Smith admitted several of the credit card charges on exhibits 15 and 16 were solely for his own benefit. Exhibits 15, 16, and 21 showed Lance's balance due for credit card charges on his account from the period immediately before his hospitalization until after his death. Those exhibits established that Smith never paid down Lance's credit card balance in full, something that would not have been apparent if only viewing the checks in evidence. Additionally, those exhibits reflected that the total credit line was $5,000 and that balances due were close to reaching that limit. As of October 2, 2016, the balance was $4,053.30 (check number 4478, dated October 17, paid $1,500 on the account), and as of November 2, the balance was $4,932.09 (check number 4338, dated November 2, paid $2,500 on the account).

Smith claimed he acted to carry out Lance's alleged wishes that he take care of Ed and take care of Lance's bills. Regardless of Lance's directions to Smith, if any, the evidence of Smith's frequent self-serving use of Lance's credit card during the time stated above was part of the factual setting relating to Smith's signing of the checks within the same timeframe. Without that evidence, the jury would not have had a coherent picture of why Smith wrote two checks, more than 2 weeks apart, for different amounts from Ed's account to pay on Lance's credit union account. See *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016) (evidence of defendant's threat to victim necessary to present coherent picture of defendant shooting victim 2 days later; otherwise shooting would have appeared random where only other interaction between them was when victim complimented defendant's car).

Exhibit 21 reflects that there was only $946.70 available credit remaining before hitting the $5,000 total credit line. Despite that, the following statement, exhibit 15, states that total

charges, without interest, equaled $2,352.01 (including small portion of transactions from before Lance's hospitalization) and that there was merely $67.91 available cash at that time before reaching the total credit line. Near the end of the month relevant to that billing period (October 2016), Smith's payment (via check 4478) of $1,500 was applied to the account. Further, exhibit 16 shows a total of $2,716.77 in charges, without interest. Near the beginning of the month relevant to that billing period (November), Smith's payment (via check 4338) of $2,500 was applied to the account.

The State's theory was that Smith "used the credit card for his personal benefit and charged over $2000 to it, and then wrote checks to pay down the balance of the credit card to be able to continue to use it." Brief for appellee at 21. Evidence of Smith's use of Lance's credit card was necessary for the State to present a full picture of the facts surrounding the charged conduct. Further, evidence of Smith's use of Lance's credit card was inextricably intertwined with Smith's alleged forgery of checks and, therefore, the disputed evidence was not subject to § 27-404. See, *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017); *State v. Parnell, supra*. The district court did not abuse its discretion by allowing the evidence.

Smith further argues that "Rule 403" should have barred admission of evidence of "the credit card transactions," claiming whatever probative value his use of the credit card may have had was outweighed by its prejudicial effect and confusion of the issues. Brief for appellant at 26. At the time of his objection to the disputed evidence, Smith did not object on the ground that it violated Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016). It is well settled that failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Casterline*, 293 Neb. 41, 878 N.W.2d 38 (2016). On appeal, a defendant may not assert a different ground for his objection to the admission of evidence than was offered at trial. *Id*.

However, because Lance raises an ineffective assistance of counsel claim based on trial counsel's failure to object to the credit card transaction evidence on "Rule 403" grounds, we address the merit of such an objection here. We conclude that evidence related to Smith's use of Lance's credit card was relevant and admissible under § 27-403. Evidence is relevant if it tends in any degree to alter the probability of a material fact. *State v. Chauncey*, 295 Neb. 453, 890 N.W.2d 453 (2017). Under § 27-403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party. *State v. Chauncey, supra*. Unfair prejudice means an undue tendency to suggest a decision based on an improper basis. *Id.* Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis. *Id.* Section 27-403 also allows for exclusion of relevant evidence if its probative value is substantially outweighed by the danger of confusion of the issues.

As asserted by the State, and as previously discussed above, Smith's use of Lance's credit card provided context for why Smith forged the checks. Further, the record refutes that there was any confusion of the issues that led the jury to reach its verdict based on evidence of credit card usage. The jury was instructed to "separately consider the four checks charged" and the jury was provided with elements of the charged offense of forgery for each pertinent check number (4338,

4476, 4478, and 4479). Smith admitted to signing each of the four checks with Lance's name. Smith's defense was that his use of the checks and credit cards was authorized by Lance. However, there was also evidence those transactions were not authorized by anyone with authority to do so. The evidence related to the credit cards did not confuse the issues; rather, it explained why Smith wrote check 4478 ($1,500) and check 4338 ($2,500) to Lance's credit union. Such evidence could not be more prejudicial than probative given Smith's own claim that the credit cards were used primarily for Ed's benefit as requested by Lance, which was the essence of Smith's defense. A Rule 403 objection would not have been successful, even if made, and thus, this claim of ineffective assistance of trial counsel fails. See *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017) (as matter of law, counsel cannot be ineffective for failing to raise meritless argument).

### 2. SUFFICIENCY OF EVIDENCE

#### (a) Smith Forged Checks in Violation of Nebraska Law

Smith argues there was insufficient evidence to support his conviction. He first asserts that because he signed Lance's name on each of the four checks rather than Ed's name, there was a "variance between the allegations of the Amended Information [which charged Smith with drawing checks on Ed's account] and the proof at trial." Brief for appellant at 20. Smith "cannot contemplate how [him] signing Lance's name to a check that Lance had no authority to sign, created or affected a 'legal right' related to ***Ed Erdman's*** account," and contends that "[the bank] was clearly under no obligation to honor the check." Reply brief for appellant at 3-4 (emphasis in original; brackets supplied).

Smith was convicted of second degree forgery under Neb. Rev. Stat. § 28-603(1) (Reissue 2016), which provides:

> [w]hoever, with intent to deceive or harm, falsely makes, completes, endorses, alters, or utters any written instrument which is or purports to be, or which is calculated to become or to represent if completed, a written instrument which does or may evidence, create, transfer, terminate, or otherwise affect a legal right, interest, obligation, or status, commits forgery in the second degree.

The definition of the term written instrument is broad and encompasses checks. See Neb. Rev. Stat. § 28-601(1) (Reissue 2016). See generally *State v. Tate*, 222 Neb. 586, 385 N.W.2d 456 (1986). An incomplete written instrument means one which contains some matter by way of content or authentication but which requires additional matter in order to render it a complete written instrument. § 28-601(3). A complete written instrument means a written instrument which purports to be genuine and fully drawn with respect to every essential feature thereof. § 28-601(2). Forged instrument means, among other things, a written instrument which has been falsely completed. § 28-601(7).

To falsely complete a written instrument means to transform an incomplete written instrument into a complete one by adding, inserting, or changing matter *without the authority of anyone entitled to grant such authority*, so that the complete written instrument falsely appears or purports to be in all respects an authentic creation of or fully authorized by its ostensible maker.

§ 28-601(5) (emphasis added). See, also, Black's Law Dictionary 1276 (10th ed. 2014) (ostensible means "[o]pen to view; declared or professed; apparent"). The Nebraska Supreme Court has stated that in order to prove the offense of forgery of a check, the State must show beyond a reasonable doubt that the check was signed by the defendant without the authorization of the party whose name was used and that it was forged with intent to defraud. See *State v. Laflin*, 201 Neb. 824, 272 N.W.2d 376 (1978) (check signed in account holder's name; evidence suggested defendant signed check without authorization of anyone entitled to grant such authority; account holder or account holder's only authorized signer, his bookkeeper; defendant's forgery conviction affirmed).

Smith admitted that (1) he wrote checks 4338, 4476, 4478, and 4479, and (2) he signed Lance's name to them. In so doing, Smith transformed those incomplete checks into complete ones by writing upon it to indicate the date, amount of funds payable, and who or what entity was to receive those funds and by signing them with Lance's name as maker. See § 28-601(2) and (3).

Smith conceded that he knew he could not sign his name on one of the checks paid to the order of the credit union, so he signed Lance's name because "Lance is the one that's [sic] name is on that check." Smith also indicated that when writing the checks he saw both Lance's and Ed's names upon them. The checks show that the pre-printed names in the upper left-hand corner were "Edward E Erdman" and "Lance E Erdman." Sharon and Ed referred to those checks as "old," and exhibit 3 includes the signature card addendum removing Lance as an account owner from Ed's account in 2014--long before Smith wrote checks 4338, 4476, 4478, and 4479.

Viewing the evidence in the light most favorable to the State, the evidence supports that Smith completed those checks "without the authority of anyone entitled to grant such authority." See § 28-601(5). Lance had no actual authority in connection with Ed's account in 2016. Ed was the only individual entitled to grant such authority on that account at the time checks 4476, 4478, and 4479 were completed. Ed denied that he wrote or authorized those checks. At the time Smith completed check 4338 (after Lance's death), Ed and Sharon (added as an account holder on October 26) were the only individuals entitled to grant such authority on the account. Ed denied that he wrote or authorized check 4338, and from Sharon's testimony of how she discovered the checks, the jury could reasonably infer she did not write or authorize check 4338 either.

Because Smith signed Lance's name to the checks, they falsely purported to be "in all respects authentic creations of . . . its ostensible maker": Lance. *Id*. Because Lance's name was pre-printed on the old checks, it appeared, albeit inaccurately, as though Lance was somehow still authorized on the account. In other words, Smith's signing of Lance's name gave the appearance of a genuine check (four times); we note that whether the bank had to honor the checks is irrelevant under the governing law of the charged offense. As a result, a jury could reasonably conclude that Smith falsely completed checks 4338, 4476, 4478, and 4479. *Id*. Those falsely completed checks were forged instruments. See § 28-601(7).

Moreover, there was sufficient evidence that Smith falsely completed those four checks to affect a "legal right, interest, obligation, or status" upon Ed's bank account. See § 28-603(1). Where the evidence clearly establishes the forgery of a bank check, it is immaterial whether the check was ever presented to a bank for payment. See *State v. Laflin, supra*. Nevertheless, the evidence shows that the four checks at issue were presented to the bank for payment and thus

affected Ed's interest in his bank account. Not only did Smith falsely complete the four checks, but he also took the next step in offering each check for payment, thereby affecting the funds in Ed's bank account. Exhibit 8 shows checks 4476 (L.E.S.) and 4478 (payment to credit union) were presented to the bank "[c]onventionally" (not electronically) on October 24. Exhibit 9 shows checks 4338 (payment to credit union) and 4479 (payment to Smith directly) were presented to the bank in the same manner, on November 8 and October 28, respectively. Exhibits 8 and 9 show the checks were credited from Ed's account.

Smith also argues that there was insufficient evidence to prove another required element of § 28-603(1), intent to harm or deceive, as to the three checks that paid for Lance's bills. While there may have been no harm or personal benefit to Smith by paying the L.E.S. bill, there was certainly evidence showing Smith personally benefitted from the other forged checks. Regardless, whether someone personally benefits from a forgery is not the standard for determining an intent to harm or deceive. Knowingly passing a forged instrument as genuine is conclusive of an intent to defraud. *State v. Laflin, supra.* Construing the evidence most favorably to the State, the evidence supports that Smith knew the checks, which he himself completed, were forged. Namely, although Smith acknowledged that when writing the checks he saw both Ed's and Lance's names on those checks, Smith only signed Lance's name on them. Generally, Smith related how he spent time with Ed when Lance was hospitalized and "became a little closer" to Ed "when Lance passed." Ed agreed that he rode with Smith to the hospital 4 to 10 times, yet on none of those occasions did Smith tell him that he had been writing checks on Ed's account. And Ed said Smith never told him he was going to write the checks at issue. A reasonable inference is that Smith knew Lance did not have any authority on Ed's account in 2016, but thought he could pass off checks signed in Lance's name as true and genuine because Lance's name was still pre-printed on the checks. This evidence sufficiently demonstrates an intent to deceive. Further evidence of deception was Smith's act of presenting the checks for payment on the pretense that they were true and genuine documents, while knowing they were not. See *State v. Ward*, 1 Neb. App. 558, 510 N.W.2d 320 (1993) (defendant's attempt to present forged check in exchange for money was, by very act, representing that check as true and genuine). The evidence showed Smith caused all four forged checks to be presented to Ed's bank and, by that very act, represented they were true and genuine although Smith knew he forged them, which indicated his intent to defraud.

(b) Amount of Forged Checks Wrongfully Procured Exceeded $5,000

Smith disputes that the evidence was sufficient to support that the aggregated loss exceeded $5,000. He asserts the jury was wrong to conclude that there was "any intent to[] harm Ed in the face value of the checks written for accounts that either benefited [Ed] or [Lance]." Brief for appellant at 23. Smith suggests the jury should have disregarded all checks except the "$1,500 check to [himself] and arguably the $950.00 he charged on Lance's credit card," so that the amount of fraud would have totaled "more than $1,500, but less than $5,000." *Id.* at 24.

We have already explained there is sufficient evidence to support that Smith forged the four checks in violation of § 28-603(1). In relevant part, § 28-603(6) provides:

> For the purpose of determining the class of penalty for forgery in the second degree, the
> face values, or purported face values, or the amounts of any proceeds wrongfully procured

or intended to be procured by the use of more than one such instrument, may be aggregated in the indictment or information if such instruments were part of the same scheme or course of conduct which took place within a sixty-day period and within one county.

The evidence reflects the forged checks were part of the same scheme--all written after Lance was hospitalized, in an apparent effort to benefit Smith and/or conceal his use of Lance's credit card--and were completed within the State's alleged timeframe of October 7 to November 30, 2016 (within 60 days). And Sharon, Sonya, and Ed testified that the events took place in Lancaster County.

Under § 28-603(2), "[f]orgery in the second degree is a Class IIA felony when the face value, or purported face value, or the amount of any proceeds wrongfully procured or intended to be procured by the use of such instrument, is five thousand dollars or more." Whether Smith intended to harm Ed or Lance by forging the checks is not relevant when giving effect to § 28-603(2). See *State v. Railos*, 301 Neb. 1027, 921 N.W.2d 362 (2019) (in reading penal statute, court must determine and give effect to Legislature's purpose and intent as ascertained from entire language of statute considered in its plain, ordinary, and popular sense). Smith wrongfully procured funds from Ed's bank account by completing each check and causing payment to be made from Ed's account.

The jury found that the amounts wrongfully procured or intended to be procured by each check was the amount of their face values: check 4479 ($1,500), check 4478 ($1,500), check 4338 ($2,500), and check 4476 ($62.04). Those face values add up to $5,562.04, the same amount which the jury found to be the aggregate amount of proceeds wrongfully procured or intended to be procured. Therefore, there was sufficient evidence to convict Smith of second degree forgery ($5,000 or more). See § 28-603(2) and (6).

### 3. INEFFECTIVE ASSISTANCE OF COUNSEL

Smith claims his trial counsel was ineffective in several ways. His trial counsel is different from his appellate counsel for this direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record in order to preserve such claim. *State v. Spang*, 302 Neb. 285, 923 N.W.2d 59 (2019). Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.* An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. See *id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant has the burden to show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Spang, supra*. An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order. *Id.* To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *Id.* To show prejudice, the defendant

must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*

With these governing principles in mind, we address each of Smith's claims of ineffective assistance of trial counsel in the order in which Smith raised them in his appellate brief. However, we previously addressed Smith's claim regarding his trial counsel's failure to argue that evidence of Smith's use of Lance's credit card should have been excluded as unduly prejudicial under § 27-403, and therefore, we need not address it again here.

### (a) Not Moving for Dismissal or Directed Verdict Due to Material Variance Between Charge and Evidence

Smith claims his trial counsel was ineffective for not moving to dismiss the charge or for a directed verdict "based on the material variance between the charge and the evidence with respect to his signing the name of Lance . . . to the checks at [Ed's bank], rather than the name of Ed . . . as alleged in the Amended Information." Brief for appellant at 27. In our discussion of the sufficiency of the evidence, we addressed how there is no merit to this argument. Trial counsel could not be ineffective for failing to move for a motion to dismiss or for a directed verdict based upon a meritless argument. See *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017) (as matter of law, counsel cannot be ineffective for failing to raise meritless argument).

### (b) Not Arguing or Discussing With Smith That Evidence Only Supported Theory of Attempted Forgery

Smith asserts that his trial counsel "failed to argue, or otherwise discuss with [him], that the evidence at trial only supported a theory of attempted forgery based upon the fact that Lance had no ownership interest in, or signatory authority over, [Ed's account]." Brief for appellant at 28. As previously discussed, we found there was sufficient evidence for Smith's conviction of second degree forgery despite Smith signing Lance's name on an account over which Lance no longer had any authority. Therefore, Smith could not have been prejudiced by his trial counsel not arguing the applicability of a theory of attempted forgery or discussing the same with Smith. This claim of ineffective assistance of trial counsel fails.

### (c) Not Requesting Jury Instruction on Attempted Second Degree Forgery

Smith complains that his trial counsel did not request a jury instruction on attempted second degree forgery. Every completed crime necessarily includes an attempt to commit it. *State v. James*, 265 Neb. 243, 655 N.W.2d 891 (2003). A defendant's conduct rises to criminal attempt if he or she intentionally engages in conduct which, under the circumstances as he or she believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his or her commission of the crime. *State v. Cruz*, 23 Neb. App. 814, 876 N.W.2d 404 (2016). A court must instruct a jury on a lesser-included offense if (1) the elements of the lesser offense are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense. *State v. Erpelding*, 292 Neb. 351, 874 N.W.2d 265 (2015). In this case, the State's evidence against Smith was substantial and

- 14 -

was sufficient to establish his violation of § 28-603(1). Further, the record supports that the evidence did not produce a rational basis for acquitting Smith of second degree forgery and instead convicting him of mere attempt of that offense. Smith admitted to signing Lance's name on the checks and presenting them for payment; the issue was not whether he attempted to falsify the completion of the checks or only attempted to cause payment of those checks from Ed's account. Rather, the jury had to decide whether Smith was authorized to complete the checks, as he suggested at trial. There was no rational basis in the evidence to acquit Smith of second degree forgery and convict him of attempted second degree forgery. Therefore, the district court was not required to instruct the jury on the lesser-included offense, and Smith's trial counsel could not have been ineffective for failing to request the court to do so. See *State v. Erpelding, supra* (defense counsel is not ineffective for failing to raise argument that has no merit). There is no merit to this claim of ineffective assistance of trial counsel.

(d) Not Calling Witnesses Smith Requested to Testify

Smith claims his trial counsel failed to call several witnesses who he requested to testify, alleged as follows:

a. Witnesses from the apartment complex where Lance and [Smith] lived to prove they were good friends who would attest to the close nature of their relationship.

b. Witnesses from the hospital staff to testify and corroborate [Smith's] claim that he was at the hospital every day visiting Lance before he died.

c. Emergency medical technicians who attended to Lance's medical episode just prior to his hospitalization who overhead Lance say to [Smith] that he "should take care of his dad".

d. Brandon Erdman . . . could have testified to the nature of [Smith's] relationship with Lance to rebut the [S]tate's evidence that [Smith] . . . did not do things for Lance that [Smith] testified to at trial.

Brief for appellant at 29.

We conclude there is no merit to Smith's claim with regard to trial counsel failing to call these witnesses. Testimony from other witnesses about a positive relationship between Lance and Smith, or how Smith visited the hospital every day, or the things Smith did for Lance, would have been cumulative to Smith's own testimony regarding the same. Further, such evidence is irrelevant to whether Smith had authority to write checks on Ed's account. As for testimony from emergency medical technicians who allegedly overheard Lance's statement to Smith that Smith should take care of Ed is likewise cumulative to Smith's own testimony, and again, is irrelevant to whether Smith had authority to write checks on Ed's account. Asking a person to take care of a parent does not equate with granting authority to write checks on the requesting party's bank account, much less on an account over which the requesting party has no authority. Thus, Smith could not be prejudiced by trial counsel not calling these particular witnesses. See *State v. McSwine*, 24 Neb. App. 453, 890 N.W.2d 518 (2017) (defendant not prejudiced by trial counsel's failure to obtain evidence that would have been cumulative and would not have changed trial's result).

Smith also claims that his trial counsel failed "to elicit testimony [including during Smith's direct examination] or offer exhibits that would show that while Lance was alive, [Smith] would use Lance's credit card, for his benefit and for Lance's benefit[.]" Brief for appellant at 29. Whether Lance permitted Smith to use Lance's credit card before his death is irrelevant to whether Smith committed forgery by writing checks on Ed's account. Even if Smith used Lance's credit cards based upon past practices, such evidence does nothing to establish that Smith was authorized to write checks on Ed's account. Failing to elicit such testimony could not result in prejudice to Smith, and thus this claim of ineffective assistance of trial counsel also fails.

(e) Not Cross-Examining Ed About Rent Check

Smith claims his trial counsel "failed to cross examine Ed" about Smith's claim that Smith "prepared Ed's rent check for him to sign and Ed then signed the check." *Id*. On direct examination, Smith identified exhibit 10 (check 4302) as a rent check for "Lance and Ed's apartment" and said that he wrote the check on October 30, 2016. Smith said the check was written on the account of "Ed and Lance," the same account discussed the entire trial. Exhibit 10 reflects the check is signed with Ed's name as its maker. Smith's trial counsel asked if Smith signed that check, to which he replied: "I did not." Smith's trial counsel asked who signed it, and Smith answered that "Ed signed it" but that he (Smith) filled it out. When asked why he filled the check out, Smith testified he was "over writing checks to pay the bills," and told Ed the rent check was due. Smith "was writing the check" then said, "'Ed, do you want to sign this, or do you want me [Smith] to sign it?' And he [Ed] said 'Oh, I'll sign it.'"

The record confirms that Smith's trial counsel did not cross-examine Ed about exhibit 10. However, Smith does not explain what evidence of any significance he would have expected to obtain on cross-examination, and therefore this claim is arguably insufficiently made. Nevertheless, even assuming Smith's trial counsel was somehow deficient for not cross-examining Ed about the rent check, Smith cannot show prejudice since the State did not allege that Smith forged that check. As to the four checks that were alleged as forged, Smith admitted he signed them in Lance's name (not Ed's name), and Ed said he had not authorized any of those checks. The manner in which Smith claimed check 4302 came about is not comparable to the evidence about the forged checks. If anything, Smith's own testimony that Ed did not allow Smith to sign the rent check when asked by Smith to do so further supports the State's position that Ed never authorized Smith to sign checks on his account, not even while sitting in the same room with Smith.

We are unable to ascertain how cross-examining Ed about the rent check would have been beneficial to Smith, nor does Smith provide us any direction on this. But even assuming trial counsel was somehow deficient in this regard, we conclude that Smith could not establish prejudice; thus, his claim fails. Although specific allegations of prejudice are not required to be alleged on direct appeal, see *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014), an ineffective assistance of counsel claim can be found to be without merit if the record establishes that prejudice could not be established, see *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019) (ineffective assistance of counsel claim made on direct appeal can be found to be without merit if

record establishes that trial counsel's performance was not deficient or that appellant could not establish prejudice).

## VI. CONCLUSION

We affirm Smith's conviction and find the record sufficient to determine that all of his ineffective assistance of trial counsel claims fail.

AFFIRMED.